1  AARON J. FISCHER (SBN 247391)
   aaron.fischer@disabilityrightsca.org
2  DISABILITY RIGHTS CALIFORNIA
3  1330 Broadway, Suite 500
   Oakland, CA 94612
4  Telephone:  (510) 267-1200
   Facsimile:   (510) 267-1201
5
6  JULIA E. ROMANO (SBN 260857)
   jromano@kslaw.com
7  JENNIFER T. STEWART (SBN 298798)
   jstewart@kslaw.com
8  STACY L. FOSTER (SBN 285544)
   sfoster@kslaw.com
9  KING & SPALDING LLP
10 633 W Fifth Street, Suite 1600
   Los Angeles, CA  900781
11 Telephone:  (213) 443-4355
   Facsimile:   (213) 443-4310
12
13 Attorneys for Plaintiffs

14 [Additional Counsel Listed On Second Page]

15              **UNITED STATES DISTRICT COURT**

16             **CENTRAL DISTRICT OF CALIFORNIA**

17

| | |
|---|---|
| 18  CLAY MURRAY, DAVID FRANCO, SHAREEN WINKLE, MARIA | Case No. 2:17-cv-08805-GW-JPR |
| 19  TRACY, ERICK BROWN, on behalf of themselves and all others similarly | **CLASS ACTION** |
| 20  situated, | **STIPULATED JUDGMENT** |
| 21              Plaintiffs, | Complaint Filed:  December 6, 2017 |
| 22       v. | |
| 23 | |
| 24  COUNTY OF SANTA BARBARA, and SANTA BARBARA COUNTY | |
| 25  SHERIFF'S OFFICE, | |
| 26              Defendants. | |

27

28

DON SPECTER (SBN 83925)
dspecter@prisonlaw.com
CORENE KENDRICK (SBN 226642)
ckendrick@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA  94710
Telephone:   (510) 280-2621
Facsimile:    (510) 280-2704

DONALD F. ZIMMER, JR. (SBN 112279)
fzimmer@kslaw.com
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone:  (415) 318-1220
Facsimile:    (415) 318-1300

JOSHUA C. TOLL (Admitted *Pro Hac Vice*)
jtoll@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington DC 20036
Telephone:   (202) 737-8616
Facsimile:    (202) 626-3727

- 1 -

**A. Introduction**

1. The Parties to this Stipulated Judgment (hereinafter "Stipulated Judgment") are the Plaintiff Class consisting of "all people who are now, or in the future will be, incarcerated in the Santa Barbara County Jail system" and the Plaintiff Disability Subclass of "[a]ll people who are now, or in the future will be, incarcerated in the Santa Barbara County Jail system and who are qualified individuals with disabilities, as that term is defined in the Americans with Disabilities Act (ADA), 42 U.S.C. §12102, the Rehabilitation Act, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m)," *see* ECF No. 35 at 2 (collectively, "Plaintiffs"), and Defendants County of Santa Barbara and Santa Barbara County Sheriff's Office (collectively, "Defendants").

2. Plaintiffs filed this lawsuit (the "Action") on December 6, 2017. ECF. No. 1. The Action alleges that: Defendants hold Plaintiffs in deficient facilities that are overcrowded, understaffed, and unsanitary; fail to provide minimally adequate medical and mental health care to people incarcerated in the Jail; and subject people in the jails to the harmful and excessive use of solitary confinement and other custodial restrictions in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

3. The Action also alleges that Defendants discriminate against individuals with disabilities in violation of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. Defendants have denied liability.

4. On May 31, 2018, the Court granted the Plaintiffs' unopposed motion for class certification. ECF No. 35.

5. Prior to the filing of this Action, Disability Rights California, Prison Law Office, King & Spalding and the County of Santa Barbara entered into a Structured Negotiations Agreement as an alternative to adversarial litigation. ECF No. 37 at 4-5. The Parties agreed upon a process for the retention of mutually agreed-upon

experts to evaluate the policies, procedures, practices, and conditions at the Jail and to complete reports. Consistent with the Agreement, the County retained four recognized experts (the "Subject Matter Experts"): Scott A. Allen, M.D., as the expert on medical care, Roberta Stellman, M.D., as the expert on mental health care, Margo Frasier as the expert on custody operations, and Vanir Construction Management, Inc., as the expert on disability accessibility issues. Based on the reports of the joint experts and the Parties' negotiations, the Parties subsequently retained Harry Grenawitzke as an additional Subject Matter Expert, specifically to assess environmental health and life safety issues in the Jail facilities.

6. The Subject Matter Experts conducted extensive tours and reviews of the Jail facilities, policies, and procedures. The Subject Matter Experts submitted their final reports setting forth their respective findings and making recommendations for remedial action.  Their reports are part of the record in this case.  ECF Nos. 23-2 (Medical Care-Allen), 23-3 (Mental Health Care-Stellman), 48-1 (Custody Operations-Frasier) (non-confidential executive summaries); ECF Nos. 29 (Medical Care -Allen), 30 (Mental Health Care-Stellman), 67-1 (Custody Operations-Frasier) (confidential full reports filed under seal pursuant to Protective Order); ECF Nos. 61-1 (ADA/Disability-Vanir), 65-1 (Environmental Health and Safety-Grenawitzke) (full reports).

7. The Parties have negotiated remedial plans pertaining to the matters alleged in the Action.  Those plans have been incorporated into a single, global Remedial Plan, attached hereto as **Exhibit A**.

8. Each party to this Stipulated Judgment was represented by counsel during its negotiation and execution. Plaintiffs are represented by Aaron J. Fischer of Disability Rights California; Don Specter and Corene Kendrick of Prison Law Office; and Julia E. Romano, Jennifer T. Stewart, Stacy L. Foster, Donald F. Zimmer, and Joshua C. Toll of King & Spalding LLP. Defendants are represented

- 2 -

by Amber Holderness and Michelle Montez of the Santa Barbara Office of County Counsel.

9.   Through this Stipulated Judgment, Defendants agree to implement the measures set forth in the Remedial Plan, subject to monitoring by the Remedial Plan Experts and Plaintiffs' counsel, negotiation between the Parties, and, if necessary, enforcement by the Court after use of the Dispute Resolution procedure set forth below.

**B. Remedial Plan**

10.   Defendants shall fully implement all of the remedial measures, according to the specified timeframes (where identified), set forth in the Remedial Plan.  For remedial measures requiring a remodel, reconfiguration, or renovation of the Main Jail, Defendants shall fully implement those measures on or before July 1, 2023, subject to all applicable California Environmental Quality Act ("CEQA") review processes, permitting requirements, public comment and hearing requirements, and other public approval processes.  These include Remedial Plan provisions II.D.1 (Clinical Treatment and Office Space for Health Care Service Delivery) and V.P.1 (Main Jail ADA/Accessibility Physical Plant Issues).  Defendants shall make best efforts to give notice to Plaintiffs by January 1, 2023, if the County deems that it cannot complete implementation of the provisions specified in this paragraph by July 1, 2023 due to information produced from any required CEQA review process, public review and hearing processes, or construction issues.  In any event, the County will within ten (10) days of making such determination provide written notice of the anticipated delay to Plaintiffs. The notice will include the new information leading to the delay, a proposed alternative schedule for completing implementation, and if the proposed schedule delays implementation for more than 180 days, a proposal to modify the remedial plan, as applicable.

11. Defendants shall implement the remedial measures covering minimum out-of-cell time at the Main Jail and specialized mental health unit programing at the Main Jail (Remedial Plan provisions III.D.3, III.D.5-7, and VII.D) incrementally where remodel, reconfiguration, or renovation of the Main Jail facility is necessary to achieve full implementation. Defendants agree that, during the period of implementation, they will take all reasonable steps to provide out-of-cell time and programming as specified in the Remedial Plan to the maximum extent possible.

12. Nothing in this Stipulated Judgment and the attached Remedial Plan requires the continued or prospective operation of any jail facilities, including at the Main Jail and at the Northern Branch Jail. The provisions in the Remedial Plan shall apply to all units and facilities that Defendants choose to operate for the confinement of class members.

13. The Parties agree that population-related stressors pose operational challenges to Defendants' ability to comply with this Remedial Plan, particularly with respect to provisions relating to minimum requirements for out-of-cell time. Under the Remedial Plan, Defendants will agree to not house prisoners in housing units in such a way as to exceed the rated capacity, and will ensure that each prisoner in custody at the Jail is provided a bed. The Parties recognize that if Jail population-related stressors are reduced, particularly as to people with disabilities, Defendants will be better able to ensure implementation of the Remedial Plan. Defendants have recently created a Pre-Arraignment Unit to facilitate early connections with community services and release from custody when consistent with public safety, a Law Enforcement and Mobile Crisis Mental Health co-response pilot program, a Sobering Center, and a centralized crisis services hub. The Parties agree that if the size of the Jail's population prevents timely and sufficient implementation of and compliance with the Remedial Plan, the Parties will meet and confer regarding additional population reduction measures.

- 4 -

14.   Defendants shall develop and implement appropriate and adequate plans, policies, and practices to ensure compliance with the Remedial Plan.  At least 21 days prior to finalizing or implementing any new plans or policies developed to meet the terms of the Remedial Plan, Defendants shall submit such plans or policies to Plaintiffs' counsel for review and comment.

15.   Within 120 days after this Stipulated Judgment is approved by the Court, Defendants shall provide to Plaintiffs' counsel and the Remedial Plan Experts (discussed below) a Status Report which shall (1) include a description of the steps taken by Defendants to implement each provision set forth in the Remedial Plan; and (2) specify provisions of the Remedial Plan that have not yet been implemented. With respect to the provisions of the Remedial Plan not yet implemented, Defendants' Status Report shall (i) describe all steps taken toward implementation; (ii) set forth with as much specificity as possible those factors contributing to non-implementation; and (iii) set forth a projected timeline for anticipated implementation.

16.   Following the first Status Report and at the end of each subsequent 180-day period during the term of this Stipulated Judgment, Defendants shall provide to Plaintiffs' counsel and the Remedial Plan Experts (discussed below) an updated Status Report addressing each item of the Remedial Plan for which monitoring is not suspended, as set forth in Part I, below.

17.   The parties recognize that the COVID-19 public health emergency may impact the ability of the Remedial Plan Experts and Plaintiffs' counsel to conduct on-site monitoring in the Jail facilities.  The parties will meet and confer as needed should public health needs related to the pandemic prevent timely completion of on-site monitoring as set forth in the Stipulated Judgment. The parties agree that, under such circumstances, other aspects of monitoring and Remedial Plan implementation can and should continue, including production of requested data

and information consistent with the Stipulated Judgment.  Defendants agree to provide reasonably requested data and information to, and confer in a reasonable timeframe with, Plaintiffs' counsel on Defendants' ongoing response to the COVID-19 pandemic as it relates to the health and safety of class members.

**C. Remedial Plan Experts**

18.   The Parties jointly request that Kerry Hughes, M.D. (Mental Health, Suicide Prevention), Homer Venters, M.D. (Medical Care) and Michael Brady/Sabot Group (ADA-Disability, Environment of Care) serve as Remedial Plan Experts to (a) advise the Court on Defendants' compliance or non-compliance with the Remedial Plan, as necessary; (b) assist with dispute resolution matters addressed below; and (c) provide testimony, if required, in any proceedings before the Court.

19.   The parties continue to meet and confer to identify a mutually agreeable Remedial Plan Expert regarding custody operations, and are discussing Peter Perroncello or Terri McDonald for that role.  If the parties are unable to agree upon such expert before final approval of the Stipulated Judgment, the Parties will submit these two candidates to Magistrate Judge Abrams as the designated mediator (see Paragraph 46, below), who will assist the Parties in reaching agreement.  If Mr. Perroncello and/or Ms. McDonald become unavailable for the role at any time, the parties may propose one or two alternative candidates for the Remedial Plan Expert role.  If the parties are unable to reach agreement, Judge Abrams will select the custody operations Remedial Plan Expert from among the proposed candidates.

20.   Within 180 days after entry of this Stipulated Judgment, the Remedial Plan Experts shall each complete a review and report to advise the Parties on Defendants' progress in implementing the Remedial Plan within each expert's area

1    of expertise.  The Parties recognize that experts may assess multiple sections of the

2    Remedial Plan, so long as the provisions assessed are within their area of expertise.

3        21.  Not less than one (1) year after the completion of their respective first

4    reports, and then annually thereafter during the term of this Stipulated Judgment,

5    the Remedial Plan Experts shall complete reviews and reports ("Annual Reports")

6    to advise the Parties on Defendants' compliance or non-compliance with the

7    Remedial Plan.

8        22.  In each Annual Report, the Remedial Plan Experts shall identify whether

9    Defendants are or are not in substantial compliance with the Remedial Plan

10   provisions within the expert's area of expertise.  These findings are hereinafter

11   referred to as "Substantial Compliance Determinations."  The Annual Reports will

12   provide, to the extent possible, specific recommendations as to how Defendants

13   may reach substantial compliance.  The Parties shall have an opportunity to

14   respond to any finding regarding Defendants' compliance with any provision of the

15   Remedial Plan.  The Parties shall submit any such response to the Remedial Plan

16   Experts and all counsel within 30 days of the Annual Report completion.  The

17   Parties recognize that the Remedial Plan Experts' reports are not confidential and

18   may be submitted to the Court for purposes of any future proceedings.

19       23.  The Remedial Plan Experts' duties specified in **Exhibit B** shall be

20   provided to the Remedial Plan Experts.  The Remedial Plan Experts shall be

21   entitled to reasonable compensation based on the cost estimates and fee caps

22   provided in their respective agreements with the Parties, which shall be paid by

23   Defendants.

24       24.  With appropriate notice, the Remedial Plan Experts shall have reasonable

25   access to all parts of any Santa Barbara County facility necessary to monitoring

26   compliance with the Remedial Plan.  Access to the facilities will not be

27   unreasonably restricted.  The Remedial Plan Experts shall have access to

28

correctional health care, and other appropriate staff and people incarcerated at the jails, including confidential and voluntary interviews as is reasonable to complete a report and that does not implicate security or other privileged information.

25. The Remedial Plan Experts shall also have access to non-privileged documents, including budgetary, custody, and health care documents, and institutional meetings, proceedings, and programs to the extent the Remedial Plan Experts determine such access is needed to fulfill their obligations.  Documents produced to the Remedial Plan Experts will be made available to Plaintiffs' counsel.

26. The Remedial Plan Experts' tours shall be undertaken in a manner that does not unreasonably interfere with Jail operations. The Remedial Plan Experts shall be bound, where applicable, by the Stipulated Protective Order (ECF No. 31). The Remedial Plan Experts shall have access to individual records of people who are or have been incarcerated in the county jails, as consistent with the Court's Order for Disclosure of Confidential Inmate Records (ECF No. 42).

27. The Parties agree that they are each entitled to engage in *ex parte* communications with the Remedial Plan Experts.

28. If, for any reason, a designated Remedial Plan Expert can no longer serve, the Parties shall attempt to agree on who shall be appointed to serve in such expert's place. If the Parties do not agree, Defendants and Plaintiffs shall each nominate and submit up to two potential experts for the Magistrate Judge's consideration and selection in accordance with the dispute resolution process set forth below.

**D. Notice to Class Members**

29. Defendants shall post notices to class members of this Action in a manner agreed upon by the Parties and approved by the Court. Such notices shall include a brief statement that includes a description of Plaintiffs' claims, the definition of the

class and subclass, notice that the Parties have entered into this Stipulated Judgment, a description of the subject areas covered by the Stipulated Judgment and Remedial Plan, and contact information to allow people incarcerated in the Santa Barbara jails to contact Plaintiffs' counsel.

30.   The Parties shall meet and confer as to the content of the notice and the method for posting the notice.

31.   Defendants will post notices consistent with the Parties' agreement within 30 days after the entry of this Stipulated Judgment, and shall maintain the notices so long as the Stipulated Judgment is in effect, absent further order of the Court. In the event disagreements arise regarding the contents of such notice, the Parties will first meet and confer in an informal attempt to resolve the disagreement. Failing that, any such disagreements shall be resolved pursuant to the Dispute Resolution procedure set forth below.

**E. Plaintiffs' Monitoring and Access to Information**

32.   Plaintiffs' counsel shall be permitted to monitor Defendants' compliance with all aspects of the Remedial Plan.  Defendants shall provide Plaintiffs' counsel with access to information, including all Santa Barbara Jail facilities, staff, documents, records (including health care and/or custody files of specified incarcerated persons) that Plaintiffs' counsel believes in good faith are necessary to monitor Defendants' compliance with the Remedial Plan subject, where applicable, to the Stipulated Protective Order (ECF No. 31) and Order for Disclosure of Confidential Inmate Records (ECF No. 42) and subject to any other applicable privileges.  Defendants shall provide Plaintiffs' counsel with access to such information within 30 calendar days of their request. If Defendants believe that the information requested by Plaintiffs' counsel is not necessary to monitor compliance with the Remedial Plan, the parties shall engage in the Dispute Resolution process described herein before seeking any relief from the Court.

- 9 -

33.   From the date this Stipulated Judgment is entered by the Court, Defendants shall provide Plaintiffs' counsel the health care and/or custody files of people incarcerated or previously incarcerated in the Jail, as well as other information described above, within 21 calendar days of their request.

34.   If Defendants believe that the information requested by Plaintiffs' counsel is not necessary to monitor compliance with the Remedial Plan, the Parties shall engage in the Dispute Resolution process described below before seeking any relief from the Court.

35.   Defendants shall provide Plaintiffs' counsel with full and complete copies of the health care, custody, and investigation-related files of any incarcerated person who dies in custody. The health care and custody records shall be produced within 30 calendar days of the death. All other related documents, including, but not limited to, incident reports, autopsy reports, and death reviews (*e.g.*, psychological autopsies, mortality reviews, QI/QA reviews), shall be produced within 10 days of the document's completion.

36.   Defendants shall allow Plaintiffs' counsel and their consultants to conduct at least two tours of each Santa Barbara County jail facility per calendar year for the purpose of monitoring compliance with the Remedial Plan so long as the Stipulated Judgment is in effect.  After two years, the Parties shall meet and confer about the need for two tours per year in light of the status of Defendants' compliance with the Remedial Plan at that time, provided that tours shall not be less than one per year so long as the Stipulated Judgment is in effect.  Plaintiffs' counsel's visits to Santa Barbara County solely to meet with and/or interview class members will not be counted as a "tour" for purposes of this provision.

37.   Monitoring tours by Plaintiffs and/or their consultants shall include reasonable access to all relevant facilities, including all housing units, facilities where health care services are provided, facilities where people in Defendants'

custody are or may be housed and provided programming, and any other facilities where services are provided pursuant to the Remedial Plan.  During the tours, Defendants shall make available for interview supervisory, clinical, custodial, and program staff that have direct or supervisory responsibility for health care, classification, housing, discipline, jail operations, and disability accommodations. Defendants shall provide a Sheriff's Office contact person to ensure cooperation of staff with Plaintiffs' counsel in obtaining information requested during the tours. During the tours, Defendants shall permit and facilitate Plaintiffs' counsel having confidential and voluntary discussions with any incarcerated person or group of incarcerated people upon request, consistent with safety and security needs. Upon request by Plaintiffs and pursuant to the Protective Order (ECF No. 31) and Order for Disclosure of Confidential Inmate Records (ECF No. 42), disputes that may arise over Plaintiffs' counsel's access to information or personnel shall be addressed through the Dispute Resolution process described below.

38.  If Plaintiffs' counsel form the good faith belief that Defendants are not substantially compliant with any component of the Remedial Plan based on the reviews of the Remedial Plan Experts and/or Plaintiffs' counsel monitoring, Plaintiffs' counsel shall so inform Defendants in writing and, as applicable, the relevant Remedial Plan Expert(s) of any alleged noncompliance and identify the component(s) of the Remedial Plan alleged to be noncompliant.

39.  Defendants shall investigate the alleged noncompliance and provide Plaintiffs' counsel with a response in writing within 30 calendar days.  Either party shall have the option of requesting an investigation and opinion from the relevant Remedial Plan Expert. If Plaintiffs' counsel are not satisfied with Defendants' response, the Parties shall engage in the Dispute Resolution process described below.

40.   Defendants shall ensure that Plaintiffs' counsel have access to confidential visits and telephone calls with class members.  The Parties will establish an efficient means to allow Plaintiffs' counsel to interview a class member or group of class members, and to conduct confidential telephonic interviews with individual class members, with reasonable notice, in a manner that does not disrupt jail operations.

41.   Plaintiffs' counsel shall be allowed to send postage pre-paid envelopes (metered) to class members in the Jail.

**F.  Individual Class Member Concerns**

42.   Plaintiffs' counsel may bring concerns in writing about individual people in the jails, including but not limited to issues regarding medical and mental health care, housing, isolation, disability accommodations or access, or safety/well-being to the attention of Defendants' counsel, or their designee, who shall respond in writing within 14 calendar days, unless the urgency of the issue requires a more expedited response.  The Parties will work cooperatively to resolve individual concerns.

43.   This process is not meant to replace or circumvent the existing processes for requesting medical or mental health services, or following the existing request and grievance processes in the jails.  People in the jails will be encouraged to make use of those processes.

**G. Dispute Resolution**

44.   Either party may initiate the dispute resolution process with respect to any matter covered by this Stipulated Judgment by providing written notice of a dispute ("Dispute Notice") to the other party.

45.   Following service of the Dispute Notice, the Parties shall undertake good faith negotiations at such times and places as they deem sufficient in an effort to resolve the dispute informally between them.  If, within 30 days after service of the

- 12 -

Dispute Notice, the Parties have failed to resolve the dispute, either party may request that the Remedial Plan Expert(s) most knowledgeable in the subject matter of the dispute be permitted to evaluate the issue in dispute and prepare a report. The Remedial Plan Expert(s) must provide the report regarding the area of disagreement to the Parties within 45 days of the request.  Defendants will pay the reasonable fees as set forth in the Remedial Plan Expert's agreement with the parties for any report prepared by a Remedial Plan Expert at the request of a party about a disputed issue.

46.   The following general protocol will apply to all disputes arising under this Stipulated Judgment: In the event of disagreement between the Parties regarding any aspect of this Stipulated Judgment, including but not limited to (1) interpretation of its terms; (2) implementation of its provisions; and/or (3) a determination of the Parties' respective rights, obligations and duties, the Parties shall first undertake good faith negotiations in an effort to resolve the dispute informally between them.

47.   The Parties' informal negotiation process shall be completed within 45 days of the identification of a dispute. In the event the Parties' good faith attempt to resolve the dispute informally proves unsuccessful, the Parties shall next seek the assistance, advice, and/or guidance of the Chief Magistrate Judge Paul L. Abrams, whom the parties have agreed to designate as mediator for this case.  The parties shall request that mediation be scheduled within 90 days of the Dispute Notice, unless the parties mutually agree upon an alternative schedule.  The Dispute Resolution process shall continue until i) the Parties agree in writing that mediation is concluded; or ii) upon the request of a party, the mediator determines and so notifies the Parties in writing that the Parties are at impasse, a party is not negotiating in good faith or further negotiation would be futile.  If the Dispute

Resolution process is unsuccessful, the Parties may seek the Court's assistance in
resolving the dispute.

48.   With the exception of any report prepared by a Remedial Plan Expert, as
described above, and any notice that mediation is concluded, nothing said and no
document prepared in connection with the mediation shall be offered in evidence
in any subsequent judicial proceeding in this case.

**H. Enforcement of Stipulated Judgment**

49.   The Court shall retain jurisdiction to enforce the terms of this Stipulated
Judgment, and shall have the power to enforce the agreement through specific
performance and all other remedies permitted by law for the duration of the
Stipulated Judgment, as set forth below.

50.   The Stipulated Protective Order (ECF No. 31) and the Order for Disclosure
of Confidential Inmate Records (ECF No. 42) shall remain in force while this
Stipulated Judgment is effective.

**I.   Duration and Termination**

51.   The duration of this Stipulated Judgment is four years from the date this
Stipulated Judgment is entered by the Court, unless it is (a) terminated earlier
pursuant to the paragraph below, or (b) subject to the Dispute Resolution process,
is extended as to any provision of this Stipulated Judgment or the Remedial Plan
with which the Defendants are not in substantial compliance until such time as
substantial compliance is achieved.  Any such extension not mutually agreed upon
by the Parties shall be subject to the Dispute Resolution process set forth above.

52.   Defendants may, after conferring with Plaintiffs' counsel, request a finding
by the Remedial Plan Expert(s) that Defendants are in substantial compliance with
one or more components of the Remedial Plan and have maintained such
substantial compliance for a period of at least six (6) months.  Such a finding will

- 14 -

result in a suspension of monitoring by the relevant Remedial Plan Expert and
Plaintiffs' counsel of any such component.

53.   If Plaintiffs form the good faith belief that Defendants are no longer in
substantial compliance with any component(s) of the Remedial Plan previously
found to be in substantial compliance and as to which monitoring has been
suspended, Plaintiffs shall promptly so notify Defendants in writing and present a
summary of the evidence upon which such belief is based. Within 30 days
thereafter, Defendants shall serve a written response stating whether they agree or
disagree that they are no longer in substantial compliance with respect to the
identified component(s) of the Remedial Plan. In the event that Defendants agree,
monitoring by the Remedial Plan Experts and Plaintiffs' counsel pursuant to this
Stipulated Judgment shall resume. In the event Defendants disagree, Plaintiffs may
bring a motion before the Court seeking such relief as may be appropriate,
including but not limited to reinstating full monitoring, provided that, before
bringing such a motion, Plaintiffs have complied with the Dispute Resolution
process described herein.

54.   Defendants may seek termination of this Stipulated Judgment by bringing
a termination motion pursuant to 18 U.S.C. § 3626(b)(1)(A)(i), provided however,
that (i) Defendant shall not bring any such motion for a period of two years from
the date this Stipulated Judgment is entered by the Court; (ii) any termination
motion shall be based on a record of no less than six (6) months of substantial
compliance with all the requirements of this Stipulated Judgment and the Remedial
Plan; and (iii)  there is no Dispute Resolution process pending between the parties.

**J.  Costs and Fees**

55.   *Costs and Fees Prior to Entry of the Stipulated Judgment*: The Parties
agree that, by entry of this Stipulated Judgment, Plaintiffs are the prevailing party
in this litigation. The Prison Litigation Reform Act (PLRA), 42 U.S.C. Section

1997e, would limit the hourly rate at which Plaintiffs' counsel can be compensated in connection with certain claims in the Action, while other claims are not subject to such statutory limits.  Notwithstanding the foregoing, subject to Court approval, the Parties have reached a compromise and Defendants have agreed to pay Plaintiffs' counsel $1,132,809 for reasonable fees and expenses incurred from the date that Plaintiffs' counsel commenced an investigation into conditions at the Santa Barbara County Jail through Final Approval of the Stipulated Judgment, including approval of the Remedial Plan.

56.  *Costs and Fees for Monitoring and Enforcement*. Plaintiffs' counsel shall be compensated for their reasonable time and reasonable expenses (including the costs of any consultants Plaintiffs' counsel may retain) relating to monitoring and enforcing this Stipulated Judgment and Remedial Plan, including any time and expenses incurred in connection with the resolution of any dispute pertaining to such monitoring and enforcement.  Plaintiffs shall submit a detailed invoice for their fees and expenses (including the date, amount of time spent, and a general description of each task) at the end of every quarter.  Defendants shall pay the amount requested by Plaintiffs' counsel within 60 calendar days of receipt of each invoice.

57.  *Costs and Fees Cap for Monitoring and Enforcement*.  Plaintiffs' counsel's fees and expenses set forth in the paragraph above shall be capped at $125,000 per County fiscal year (July 1 to June 30).  In the first year of the Stipulated Judgment, the costs and fees cap shall be prorated based on the commencement date of the Stipulated Judgment with respect to the start of the fiscal year.

58.  *Costs and Fees for Future Litigation Before the Court*.  Subject to both Court approval and Defendants' right to object to the reasonableness of the number of hours for which Plaintiffs' counsel may seek compensation, Defendant agrees to

- 16 -

1   pay Plaintiffs' counsel's reasonable rates for any litigation required to enforce or

2   defend this Stipulated Judgment or Remedial Plan before the Court.

3   **K. Effect of Stipulated Judgment in Other Actions**

4       59.   Nothing in this Stipulated Judgment is intended to and does not modify,

5   revise or change any existing orders or Stipulated Judgments applicable to

6   Defendants or to operations at or people incarcerated in Santa Barbara County Jail.

7   **L. Necessity for Relief as Provided in Remedial Plans**

8       60.   The Parties agree that the relief contained herein is narrowly drawn,

9   extends no further than necessary to ensure the protection of the federal rights of

10  Plaintiffs, and is the least intrusive means necessary to accomplish those

11  objectives.

12  **IT IS SO AGREED AND STIPULATED.**

13
                             Respectfully submitted,

14

15  Dated: July 16, 2020                DISABILITY RIGHTS CALIFORNIA

16

17                               Aaron Fischer

18                               *Attorneys for Plaintiffs*

19

20  Dated: July 17, 2020                OFFICE OF COUNTY COUNSEL

21

22

23                               Amber Holderness

24                               Michelle Montez

25                               *Attorneys for Defendants*

26

27

28

1    Dated: July 16, 2020                          PRISON LAW OFFICE

2

3

4                                        Corene Kendrick
                                        *Attorneys for Plaintiffs*

5

6    Dated: July 16, 2020                          KING & SPALDING LLP

7

8

9

10                                       Julia Romano
                                        *Attorneys for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 18 -

# EXHIBIT A

*Murray v. County of Santa Barbara*

**Remedial Plan**

# TABLE OF CONTENTS

I.  Definitions ........................................................................................................... 1

II.  MEDICAL CARE ................................................................................................ 3

    A.  **County Monitoring of Private Medical Contract** ................................... 3

    B.  **Policies and Procedures** ......................................................................... 4

    C.  **Health Care Records** ............................................................................. 4

    D.  **Space for Health Care Service Delivery** ............................................... 4

    E.  **Screening on Intake** .............................................................................. 5

    F.  **Access to Care** ...................................................................................... 6

    G.  **Chronic Care** ........................................................................................ 8

    H.  **Pharmacy Services** ................................................................................ 9

    I.  **Transgender and Gender Nonconforming Health Care** ....................... 10

    J.  **Drug/Alcohol Withdrawal** .................................................................... 10

    K.  **Utilization Management** ....................................................................... 10

    L.  **Review of Inmate Deaths** .................................................................... 11

    M.  **Discharge Planning** ............................................................................. 11

    N.  **Quality Management** ........................................................................... 11

III.  MENTAL HEALTH CARE .............................................................................. 12

    A.  **Policies and Procedures** ....................................................................... 12

    B.  **Intake** ................................................................................................... 13

    C.  **Patient Privacy and Confidentiality** .................................................... 14

    D.  **Mental Health Services, Housing, and Access to Care** ....................... 15

    E.  **Psychiatric Medication Practices** ........................................................ 18

    F.  **Mental Health and Disability Input in the Jail Disciplinary Process** ............... 18

    G.  **Seclusion and Restraint** ....................................................................... 20

    H.  **Discharge and Reentry Services** .......................................................... 20

    I.  **Cross-Agency Coordination of Mental Health Treatment and Service Need** ... 21

    J.  **Continuous Quality Improvement** ....................................................... 21

IV.  SUICIDE PREVENTION ................................................................................. 23

i

| | | |
|---|---|---|
| A. | **Overview** | 23 |
| B. | **Screening for Suicide Risk** | 23 |
| C. | **Housing of Prisoners on Suicide Precautions** | 24 |
| D. | **Treatment and Conditions for Individual Prisoners on Suicide Precautions** | 25 |
| E. | **Supervision/Monitoring of Suicidal Prisoners** | 26 |
| F. | **Discharge from Suicide Precautions and Follow-Up** | 26 |
| G. | **Emergency Response** | 27 |
| H. | **Continuous Quality Improvement** | 28 |
| V. | DISABILITY ACCOMMODATIONS AND ACCESS, AMERICANS WITH DISABILITIES ACT (ADA) | 28 |
| A. | **Policy** | 28 |
| B. | **ADA Coordinator** | 29 |
| C. | **ADA Notice to Prisoners** | 29 |
| D. | **Staff Training** | 30 |
| E. | **ADA Tracking System** | 30 |
| F. | **Screening for Disability and Disability-Related Needs** | 31 |
| G. | **Disability-Related Requests and Grievances** | 32 |
| H. | **Housing Placements** | 33 |
| I. | **Visitation** | 34 |
| J. | **Access to Programs, Services, and Activities** | 34 |
| K. | **Health Care Appliances, Assistive Devices, Durable Medical Equipment** | 35 |
| L. | **Transportation** | 36 |
| M. | **Effective Communication** | 37 |
| N. | **Access for Individuals with Hearing Impairments** | 39 |
| O. | **Prisoners with Intellectual/Developmental Disabilities** | 40 |
| P. | **Physical Accessibility Requirements** | 41 |
| Q. | **Alarms/Emergencies** | 41 |
| R. | **Quality Assurance** | 42 |
| VI. | ENVIRONMENTAL HEALTH AND SAFETY | 43 |
| A. | **Environmental Health and Safety Monitor** | 43 |
| B. | **Cleanliness and Sanitation of Jail Facilities** | 43 |

C.    **Laundry** ................................................................................................ 44

D.    **Food Service and Kitchen Operations** .............................................. 45

E.    **Work Order System and Preventative Maintenance** ....................... 45

F.    **Chemical Control and Biohazardous Materials** .............................. 46

G.    **Negative Pressure Monitoring and Recording** ................................ 47

H.    **Emergency Response and Fire/Life Safety** ....................................... 47

I.    **Environment of Care Monitor Inspections, Corrective Action, and Process for Prisoners to Raise Concerns** ............................................ 47

VII.    CUSTODY OPERATIONS/SEGREGATION ......................................... 48

A.    **General Principles** ................................................................................ 48

B.    **Classification Procedures** ................................................................... 48

C.    **Elimination of Dangerous or Improper Physical Plant Features** ..... 49

D.    **Minimum Out-of-Cell Time** ................................................................ 50

E.    **Disciplinary Procedures** ...................................................................... 51

F.    **Safeguards for Prisoners Placed in Segregation** .............................. 52

G.    **Grievances, Inmate Request Forms, Property/Privileges in Segregation** .......... 53

H.    **Other Custody Operations** .................................................................. 54

VIII.    STAFFING FOR HEALTH CARE SERVICES ..................................... 54

IX.    TRAINING RELATED TO TREATMENT OF PRISONERS WITH SPECIAL NEEDS ................................................................................... 55

# *MURRAY V. COUNTY OF SANTA BARBARA*

# REMEDIAL PLAN

## I.   DEFINITIONS

**"Disability"** means any physical, cognitive, developmental, intellectual, mental, or sensory impairment that substantially limits one or more major life activities.

"**Effective Communication**" means that any written or spoken communication must be as clear and understandable to people with disabilities as it is for people who do not have disabilities.

"**Emergent**" in the context of a medical care referral means a medical care referral or request that manifests itself by acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in serious disability or death.  Emergent medical conditions include shortness of breath, uncontrolled bleeding, seizures, chest pain, and hypoglycemic shock. Emergent medical care conditions are treated as an emergency by the County. Within the context of mental health referral or request, "emergent" refers to acute symptoms in which the patient is in immediate danger to him(her) self or others. Emergent mental health conditions include a patient reporting suicidality or command hallucinations to harm self or others, or who is actively engaging in self-inflicted bodily harm.

"**Health Care Appliances, Assistive Devices, Durable Medical Equipment**" (HCA/AD/DME) refers to equipment necessary to meet or accommodate a person's medical or disability-related needs, and includes, but is not limited to, prosthetic and orthotic appliances, prosthetic appliances, eyeglasses, and other equipment used to to serve a medical purpose.

"**Individual Program Plan**" or "**IPP**" is a record of the decisions made by the planning team of a person with a developmental disability, including the person with a developmental disability, their family (when appropriate), regional center representative(s) and others.

"**Intellectual/Developmental Disability**" is a disability characterized by significant limitations in intellectual functioning (such as learning, reasoning, and problem-solving) and in adaptive behavior (conceptual skills such as language, literacy, money, time, and self-direction; social and interpersonal skills; and practical skills such as personal care and schedules/routines). This includes people for whom the onset of the disability occurred before age 18 (developmental

disabilities) and people for whom events later in life resulted in similar limitations (*e.g.*, traumatic head injury, stroke, or dementia).

"**Jail**" refers to the Santa Barbara County Jail, including its current and future jail facilities.

"**Mental health caseload**" means all prisoners in the jail with a current identified need for any mental health services.

References to "**medical services**," "**medical treatment**" and "**medical staff**" includes dental services, dental treatment and dental staff, as well as pharmacy services and pharmacy staff.

"**Provider**" means physician, dentist, physician's assistant, or nurse practitioner.

"**Qualified Health Professional**" means physicians, physician assistants, nurses, nurse practitioners, dentists, mental health professionals, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and provide health care to patients.

"**Qualified Mental Health Professional**" means psychiatrists, psychologists, master's level social workers, licensed professional counselors (including licensed MFTs), licensed nurses, or others who by virtue of their education, credentials, and experience are permitted by law to evaluate and provide mental health care to patients.

"**Qualified Sign Language Interpreter**" ("SLI") is an individual, available on-site or through a VRI service, who is adept at American Sign Language ("ASL") and has passed a test and qualified in one of the categories established by the National Association for the Deaf (NAD) or one of the categories established by the Registry of Interpreters for the Deaf (RID). For the purposes of this agreement, no incarcerated person or custody staff may serve as a SLI.

"**Routine**" means a medical care or mental health referral or request other than an emergent or urgent medical condition.  Routine medical conditions include colds, flus, complaints of pain, skin conditions, and special requests.  Routine mental health conditions include the need for a medication bridge, current mental health symptoms, current mental health treatment, refusal to answer medical intake questionnaire, reporting thoughts of hopelessness, worthlessness, or a history of mental illness, or a current or history of substance abuse, violent behavior, or victimization.

"**Segregation**" means the confinement in a locked room or cell, with or without a cellmate, with limited social contact as compared with the general population, in conditions characterized by substantial isolation, which includes 22 hours per day

or more in a cell.  If a housing unit or location meets the above definition, the unit
will be considered a Segregation unit, regardless of name.

"**Serious Mental Illness**" ("SMI") means a mental illness that results in serious
functional impairment which substantially interferes with or limits one or more
major life activities.

"**Structured Out-of-Cell Time**": Out-of-cell time in the designated mental health
units, during which services, programs, or activities that are (1) facilitated by staff
or a contractor; and (2) approved by mental health staff, are offered.

"**TTYs**" or "**TDDs**" means devices that are used with a telephone to communicate
with persons who are Deaf by typing and reading communications.

"**Unstructured Out-of-Cell Time**": Out-of-cell time that is not Structured Out-of-
Cell Time.

"**Urgent**" means a medical or mental care referral or request that manifests itself
by acute symptoms of sufficient severity that if services are not urgently received,
the patient's situation could deteriorate to the point that emergent services are
necessary.  Urgent medical conditions include hives, abscesses, allergic reactions,
signs and symptoms of cardiac conditions, and hypo/hyperglycemia.

"**Video Remote Interpreting service**" or "**VRI service**" means an interpreting
service that uses video conference technology over dedicated lines or wireless
technology offering clear, delay-free, full-motion video and audio over high-speed
connection that delivers high-quality video images as provided in 28 C.F.R. §
35.160(d).

"**Videophone**" means a device with a video camera that can perform bi-directional
video and audio transmissions between people in real-time.

"**Video-Relay Services**" or "**VRS**" is a video telecommunications relay service
that enables persons with hearing-related disabilities who use Sign Language to
communicate with voice telephone users through video equipment, such as a
Videophone, rather than through typed text.

## II.   MEDICAL CARE

### A.   County Monitoring of Private Medical Contract

1. The County shall appoint a County employee or consultant with
adequate expertise to provide ongoing monitoring and oversight of the
private Jail health care provider contract.

2.   The County's Department of Public Health and Behavioral Wellness shall actively monitor the Jail health care contract with any private health care services provider.

B.   **Policies and Procedures**

1.   The County will develop and implement policies and procedures related to the delivery of medical care specific to the County's Jail system. The County will have ownership and control over the final policies that are created from this process.

C.   **Health Care Records**

1.   The County shall implement an integrated electronic health records system and provide ongoing IT support.

2.   The County shall implement policies and procedures to ensure that health care staff adequately document health care contacts and treatment intervention information, including:

   a)   Patient housing location, type of health care service, and setting where the services were delivered;

   b)   Time of the health care encounter and time the note is generated in the system.

3.   The County shall implement policies and procedures to ensure that the electronic health record system is modified, maintained, and improved as needed on an ongoing basis.

4.   The County shall implement and utilize Jail health care forms that the County owns.

D.   **Space for Health Care Service Delivery**

1.   The County shall ensure sufficient and suitable clinical treatment and office space to support health care service delivery.  Space for health care services shall provide a therapeutic setting with adequate patient privacy and confidentiality.

2.   The parties recognize that paragraph 1, above, will require a remodel, reconfiguration, or renovation of the Main Jail subject to the timeframe set forth in the Stipulated Judgment.  The County and the Sheriff's Office agree that, during the period of renovations at the Main Jail, they will, to the maximum extent possible given existing physical plant limitations, take reasonable steps to provide

sufficient and suitable clinical treatment and office space to support health care service delivery with adequate privacy and confidentiality.

E.   **Screening on Intake**

1.   The County shall develop and implement an Intake Screening Implementation Plan that specifies standards and timelines to ensure that arriving prisoners are promptly screened for urgent health care needs (within minutes of a prisoner's arrival when possible, and in all cases within two hours of arrival), with adequate confidentiality, timely follow-up, and disability accommodations. The standards and timelines shall include medical clearance on arrival at the Jail to determine whether the prisoner must be excluded from the Jail or housed in a special placement based on medical or mental health condition, initial health screening, and an initial health assessment within timeframes based on the individual's conditions and acuity.

2.   The Intake Screening Implementation Plan shall include the following:

   a)   Standards and procedures to ensure Medication Continuity, either through outside verification or on-site physician medication order;

   b)   Procedures to ensure adequate review of individual health care records maintained by the County or otherwise available as part of the intake process;

   c)   Infectious disease screening and follow-up;

   d)   Initial Health Assessment for all incoming prisoners with chronic illnesses;

   e)   Psychological Evaluation for persons with signs of development disability;

   f)   Psychological Evaluation for persons with signs and/or histories of mental illness;

   g)   Clinical evaluation of persons in need of detoxification with clinical determinations for any use of sobering, safety or isolation cells;

     h) Use of a suicide risk assessment tool, with Psychological Evaluation for those with positive findings on the suicide assessment.

    3. Registered nurses shall perform the intake health screening, and shall receive annual training on intake policies and procedures.

F. **Access to Care**

    1. The County shall develop and implement a Health Care Implementation Plan to provide all necessary levels of care for prisoners with health care needs and to ensure that they receive timely treatment appropriate to the acuity of their conditions, consistent with established standards of care and clear timelines for routine, urgent and emergent cases.

    2. All non-emergent health care requests or referrals shall be reviewed by the triage RN within 12 hours of receipt and assigned a triage level for a Provider appointment of urgent or routine.

    3. For all health care requests or referrals, the following timelines and procedures shall apply:

      a) Patients with emergent medical conditions shall be treated or sent out for emergency treatment immediately.

      b) Patients with urgent medical conditions shall be seen by the Provider within 12 hours of review by the triage RN.  For urgent referrals that occur on the weekend when a Provider is not on-site, medical staff shall complete a phone consultation with the Provider within 12 hours of review by the triage RN, with any clinically indicated treatment or other follow-up provided.  The Provider will conduct a face-to-face appointment with the patient on the next business day.

      c) Patients with routine medical concerns shall be seen by the Provider within five (5) days of review by the triage RN, or sooner if clinically indicated.

      d) All health care requests or referrals that are received shall be seen by the RN or a Provider.  The County affirms that it does not utilize a written response only process for medical care requests and referrals.

  e) The County shall inform patients of the above timelines for urgent and routine care by including that information in the inmate orientation manual and on the medical request forms.

4. The RN or Provider shall:

  a) conduct a brief face-to-face visit with the patient in a confidential, clinical setting;

  b) take a full set of vital signs, if appropriate;

  c) conduct a physical exam, if appropriate;

  d) assign a triage level for a Provider appointment of emergent, urgent, or routine;

  e) provide over-the-counter medications pursuant to protocols; and

  f) consult with Providers regarding patient care pursuant to protocols, as appropriate.

5. The County shall ensure timely access to appropriate medical care based on the community standard, including with respect to medication practices, treatment, clinical and administrative treatment space, access to specialty care and hospitalization, emergency response, chronic care, infirmary or intermediate level of care, follow-up medical attention for prisoners discharged from the hospital, and supervision of medical staff.

6. The County shall staff and schedule dental clinics to ensure timely access to clinically indicated dental care.

  a) A qualified or appropriately trained clinician shall triage dental care requests to identify emergent or urgent dental issues that require treatment of infection or pain.

  b) Patients with emergent dental conditions shall be treated or sent out for emergency treatment immediately.

  c) Patients with urgent dental conditions shall be seen by a dentist within one (1) week, or sooner if clinically indicated.

  d) Patients with routine dental concerns shall be seen by a dentist within two (2) weeks, or sooner if clinically indicated.

7. The County shall permit patients, including those who are illiterate, non-English speaking, or otherwise unable to submit written health

care requests, to verbally request care.  Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified medical professional for response consistent with the above provisions.

8. The County shall not prohibit patients from reporting or inquiring about multiple medical needs in the same appointment.

9. The County shall designate and provide sufficient custody escorts to facilitate timely delivery of health care.

G. **Chronic Care**

1. The County shall develop and implement a Chronic Disease Management Program for the management of chronic conditions, including but not limited to diabetes mellitus, asthma and other respiratory conditions, hypertension, HIV, and hepatitis C.

2. The Chronic Disease Management Program shall include provision of written individual treatment plans, case tracking, adherence to community standards, and routine scheduled follow up with Qualified Health Professionals including specialists.

3. The Chronic Disease Management Program shall include, at a minimum, the following protocols, which will be regularly evaluated through quality management processes:

   a) A Comprehensive Asthma Protocol: The protocol shall ensure that patients with significant asthma histories are regularly evaluated by physicians. Medical staff shall use appropriate diagnostic tool(s) to assess a patient's ability to breathe.  The County will allow patients to keep prescribed rescue inhalers on their person, consistent with individualized clinical and security input.

   b) A Comprehensive Hypertension Management Protocol: The protocol shall ensure that patients with hypertension receive complete initial exams, including but not limited to lab tests and EKG's per clinical input, and medication at the appropriate times and intervals.

   c) A Comprehensive Diabetes Management Protocol: The protocol shall ensure regular testing of blood sugar and hemoglobin A1C levels for patients with diabetes, at clinically

appropriate intervals. Patients shall have access to the types of insulin and dosing frequency consistent with the treatment they were receiving prior to detention or most appropriate to their individual treatment goals and correctional setting, including multiple daily injection therapy using long-acting and rapid-acting insulins and insulin pump therapy, as clinically appropriate.  The County will provide a diabetes-appropriate diet, compiled by a qualified registered dietician, to prisoners with diabetes.

4.     The County shall develop policies and procedures to ensure that labs ordered by clinicians are drawn in a timely manner, that the results are reviewed by nurses and clinicians in a timely manner, that the results are communicated to patients in a timely manner, and that the results are placed in the patient's health care record in a timely manner.

H.   **Pharmacy Services**

1.     The County shall develop and implement policies to ensure continuity of medication at the time of Jail arrival and throughout the period of detention.  Verified medications from the community shall be continued without interruption.  Prisoners with unverified medications for serious conditions shall be evaluated promptly to ensure timely provision of necessary treatment.

2.     The County shall ensure that the Jail's formulary policies and procedures are sufficient to provide adequate individualized care to patients, including through ongoing staff training on the process of requesting non-formulary medications.

3.     The County shall revise its Keep on Person medication policies and procedures for common over-the-counter medications, including but not limited to rescue inhalers for asthma treatment.

4.     The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with applicable laws and through the following:

a)   ensuring that initial doses of prescribed medications are delivered to patients within 48 hours of the prescription, unless it is clinically indicated to deliver the medication sooner;

b) ensuring that medical staff who administer medications to patients document in the patient's Medical Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, (3) the date and time for any refusal of medication, and (4) in the event of patient refusal, documentation that the prisoner was made aware of and understands any adverse health consequences by medical staff.

5. The County shall develop and implement policies and procedures to ensure that patients are provided medications at therapeutically appropriate times, including when out to court, in transit to or from any outside appointment, or being transferred between facilities. If administration time occurs when a patient is in court, in transit or at an outside appointment, medication will be administered as close as possible to the regular administration time.

6. The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

I. **Transgender and Gender Nonconforming Health Care**

1. The County shall treat transgender prisoners based upon an individualized assessment of the patient's health care and related needs, consistent with relevant legal requirements.

J. **Drug/Alcohol Withdrawal**

1. The County shall develop and implement drug/alcohol withdrawal policies and procedures that include specific guidelines as to the frequency and documentation of patient assessment.

K. **Utilization Management**

1. The County shall develop and implement a utilization management (UM) system that ensures that health decisions about patient care are made with sufficient input from Providers and meaningful consideration of patients' health history and needs.

2. The UM process shall ensure that Providers and patients are promptly informed about decisions made through the UM process, including with respect to specialist referral requests.

3. The UM process shall include an appeal process to enable patients and Providers to appeal a decision denying a referral request.

L. **Review of Inmate Deaths**

    1.    The County shall complete timely and adequate death reviews, within 30 days of any death, including a clinical mortality review in all cases and a psychological autopsy if death was by suicide or is otherwise indicated. The County shall also complete a multidisciplinary administrative review to assess custodial and emergency response actions.

    2.    The death review process shall include a root cause analysis, as appropriate, and the development of corrective action plans to identify and address systemic or individual issues.

M. **Discharge Planning**

    1.    The County shall implement an in-custody discharge/reentry planning program, described in a written policy, with emphasis on prisoners who suffer from chronic mental health and medical conditions, including addiction.

    2.    The reentry services program shall include the provision of assistance to chronic care patients, including outpatient referrals and appointments, public benefits, inpatient treatment, and other appropriate reentry services.

N. **Quality Management**

    1.    The County shall develop a Quality Management program to regularly assess and take necessary measures to ensure quality and efficiency of care.

    2.    The County shall establish a Continuous Quality Improvement (CQI) Unit to develop tracking mechanisms and to monitor the timeliness and effectiveness of care, to be reviewed at least quarterly and with corrective action plans employed where issues are identified.

    3.    The County shall track and document all completed, delayed, and canceled medical appointments, including reasons for delays and cancelations. Such documentation shall be reviewed as part of the quality management process.

    4.    The County shall track compliance with the Chronic Disease Management Program requirements for timely provision of appointments, procedures, and medications.

5.   The County shall incorporate a systematic review of prisoner grievances related to health care into its Quality Management program.

## III.  MENTAL HEALTH CARE

### A.   Policies and Procedures

1.   The County shall develop its own county- and site-specific policies and procedures related to its jail mental health care system. Jail mental health policies and procedures shall be reviewed at least annually and updated as necessary.

2.   The County shall develop policies and procedures regarding mental health care committees that clearly describe structure, membership, and minimum meeting frequencies.

3.   The County shall ensure that its policies and procedures are consistent with the provisions of this Remedial Plan and include the following:

   a)   A written document reflecting the spectrum of mental health care programming and services provided to prisoners;

   b)   Reasonable timeframes for completion of each type of mental health care-related task or service, consistent with community and professional standards;

   c)   An intake and referral triage system to ensure timely and effective resolution of inmate requests and staff referrals for mental health care;

   d)   Clinical monitoring of inmates, including but not limited to those who are segregated or on suicide watch;

   e)   Descriptions of specialized mental health programming that specifically identify admitting and discharge criteria and the staff positions who have the authority to place inmates in specialized mental health housing;

   f)   Relevant mental health-related training for all staff members who are working with inmates with mental illness.

4.   The County's health screening policy and procedure shall include criteria for the triage system for intake referrals and health service

requests. Referrals shall be designated as emergent, urgent, or routine based on clinical judgment.

5. The County shall ensure that there is a licensed mental health professional on-site at the Jail facilities who, working in collaboration with the health care services administrator, shall be responsible for supervising the clinical aspects of the following functions:

    a) Treatment programming that meets the needs of the inmate population and is consistent with individualized treatment plans.

    b) Supervision of mental health staff to ensure appropriate in-service training, development of treatment plans, and health care record documentation.

    c) Treatment programming provided by outside mental health agencies.

6. The County shall develop policies and procedures to ensure that all clinical interactions (other than rounds) be conducted in a private and confidential manner, absent a specific, current risk that necessitates the presence of custody staff. Custody and mental health staff shall be trained accordingly.

7. The County shall develop policies and procedures on the use of de-escalation techniques and early involvement by Qualified Mental Health Professionals in situations involving an inmate with SMI.

8. When utilizing trainees, such as psychiatric interns, the County shall have a memorandum of agreement with the provider that addresses supervision and other appropriate requirements.

B. **Intake**

1. The County shall ensure implementation of a screening tool to identify individuals with mental illness, at risk of self-injury, or vulnerable to predation secondary to a mental illness. The screening tool shall:

    a) Identify risk factors or medication that require a mental health referral.

    b) Recommend housing and referrals based on the individual's diagnosis, strengths, and weaknesses.

    c) Refer inmates to mental health staff for any positive finding of mental illness, and triage all referrals as urgent, emergent, or routine.

    d) Describe signs and symptoms of conditions which justify the assignment of a DSM[1] diagnosis.

2. The County shall implement a follow-up review process for inmates who refuse the intake screening. Upon inmate refusal at intake, the intake nurse shall provide a detailed record of the inmate's presentation and an opinion regarding the inmate's condition, with appropriate referrals to psychiatry and mental health professionals.

3. Refusal to give consent at intake will not be considered an indication of refusal of any treatment and evaluation at a later time.

4. Inmates entering the facility on verified medications shall receive a referral to psychiatry at the time of intake, which will be prioritized as clinically indicated.

C. **Patient Privacy and Confidentiality**

1. The County shall provide sufficient private interviewing spaces for all clinical contacts for evaluation and/or treatment (other than rounds).

2. It shall be the policy of the County that mental health clinicians shall not conduct their clinical contacts for evaluation and/or treatment (other than rounds) at cell-front except pursuant to documented refusals or specific, documented security concerns.

3. For each clinical contact for evaluation and/or treatment (other than rounds), mental health staff shall document whether the encounter was confidential, including whether it took place at cell-front. If a contact occurs at cell-front or is otherwise non-confidential (*i.e.*, due to patient refusal or specific, documented security concern), the reason(s) shall be clearly documented in the individual patient record and will be reviewed as part of the County's Continuous Quality Improvement review procedures.

---

[1] Diagnostic and Statistical Manual of Mental Disorders, Current Edition, American Psychiatric Association

4.    The County shall implement a confidential mental health service request system that does not require patients to share confidential health information with custody or other non-health care staff.

D.   **Mental Health Services, Housing, and Access to Care**

1.    Mental health staff shall respond to mental health referrals and requests within the following timelines:

   a)   Four (4) hours for emergent cases, and sooner if clinically indicated, except that during the hours of 11:00 p.m. and 7:00 a.m., medical staff shall respond to emergent cases;

   b)   Twenty-four (24) hours for urgent cases, and sooner if clinically indicated;

   c)   One week for routine cases, and sooner if clinically indicated.

2.    The County shall implement a policy to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.

3.    The County shall develop and designate specialized mental health units, with provision of the appropriate levels of programming and treatment for each mental health care service level.

   a)   The County shall provide a sufficient number of beds at all necessary levels of clinical care and levels of security, to meet the needs of the Jail population of people with SMI.

   b)   The County shall develop referral criteria and policies regarding management, treatment, and placement of inmates with SMI.

   c)   Mental health staff shall recommend appropriate placement in and discharge from the specialized mental health units and programs for inmates with mental illness based on clinical judgment.

   d)   The County shall develop policies and procedures to house and treat inmates with mental illness at the clinically appropriate level of care.

4.    Staff shall conduct regular multidisciplinary team meetings to discuss the treatment and management of each inmate with SMI who is incapable of functioning in a general population setting or who is

housed in a specialized mental health unit, to coordinate individual health, mental health, classification and discharge needs.

   a)  The County shall include the line officer, whenever possible, in the multidisciplinary treatment team meeting. The line officer shall provide day-to-day observations on an inmate's functioning and receive input from the professional staff in management approaches.

   b)  The multidisciplinary treatment team shall determine which privileges and property shall be available to inmates. The treating clinician shall provide input as to privileges and property for inmates on psychiatric observation or suicide watch.

   c)  Treatment staff shall provide all inmates on specialty units an enhanced individualized treatment plan documented on a medical record treatment plan form and completed within the first seven days of placement on that unit. These treatment plans shall be regularly reviewed and updated as needed by the multidisciplinary treatment team, with participation of the inmate.

5.   The County shall provide a minimum of 6 hours per week, of Structured Out-of-Cell Time for therapeutic group and/or individual programming, and twelve (12) hours per week of Unstructured Out-of-Cell time (including dayroom, outdoor/recreation time, and other self-directed activities) for people with mental illness housed in specialized mental health units. The County will also provide in-cell structured programming – *i.e.*, electronic tablets – to people in these units equivalent to that provided in the general population (at least four (4) hours per day, on at least three (3) separate days per week).

   a)  It is recognized that not all inmates can participate in and/or benefit from 6 hours per week of structured treatment programming.  For those individuals with mental health treatment needs housed in the specialized mental health units and for whom fewer hours of treatment services is clinically indicated, the treating clinician will present the case and recommended treatment program to the multidisciplinary treatment team for approval. Such a Modified Individualized Treatment Plan will include a description of the diagnosis,

problems, level of functioning, medication compliance, and
rationale for scheduling fewer hours of treatment services.

b) The Modified Individualized Treatment Plan will be reviewed
by the multidisciplinary treatment team at least monthly, with
consideration of an increase in treatment activities and referral
to a higher level of care as clinically indicated.

c) The County shall establish an additional, less intensive mental
health program for individuals with mental health treatment
needs who are stable.  Such a program shall provide a
minimum of four (4) hours per week of Structured Out-of-Cell
Time for therapeutic group and/or individual programming,
subject to the Modified Individual Treatment Plan provisions
described above.

6. The County shall not house inmates with SMI meeting criteria for
placement in specialized mental health units in a segregation or
isolation unit, except as outlined below.

a) In rare cases where such an inmate presents an immediate
danger or serious danger for which there is no reasonable
alternative, such an inmate may be housed separately for the
briefest period of time necessary to address the issue, and only
with written justification for the placement that is approved by
a jail commander or designee.

b) The County shall continue to provide supervision, treatment,
and out-of-cell time consistent with the inmate's Modified
Individualized Treatment Plan.

7. The County shall develop and provide comparable and separate
services and treatment programs for male and female inmates
meeting criteria for placement in specialized mental health units.

8. The County shall provide psychiatric appointments with inmates on
the mental health caseload housing at least every 90 days, or more
often if clinically indicated, and shall provide counseling services
consistent with individual need that is documented in an
individualized treatment plan.

9. Mental health staff shall provide a behavioral management plan and
regularly scheduled counseling services to inmates with severe

personality disorders and/or frequent episodes of suicidal ideation or self-harm.

10. The County shall ensure that clinical contact record entries indicate the inmate's housing location, the type of service, the location where mental health staff delivered the service, the date and time of the encounter, and the date and time the record is generated.

E.   **Psychiatric Medication Practices**

1. The County shall, in consultation with the subject matter expert and Plaintiffs, ensure that the Jail's policies and procedures are sufficient to provide adequate individualized care to patients, including with respect to (a) non-formulary medication requests, (b) patient refusals, and (c) prescriptive practices.

2. Any inmate requesting psychiatric evaluation or treatment shall receive a timely comprehensive mental health assessment to determine clinical need for medication or other treatment.

3. No verified or prescribed psychiatric medication will be terminated or significantly changed without in-person consultation with a psychiatrist, absent clinical justification that is documented. Mental health staff shall see patients who receive significant changes in prescriptions or initiation of new medications within 30 days, unless earlier requested by patient or clinically indicated, to assess efficacy, side effects, and other follow-up as appropriate.

4. The County shall implement policies and procedures to ensure that patients are provided medications at therapeutically appropriate times (e.g., sedating medications administered at bedtime).

F.   **Mental Health and Disability Input in the Jail Disciplinary Process**

1. The County shall adopt policies and procedures that require meaningful consideration of the relationship of an inmate's behavior to a mental health or intellectual disability, the appropriateness of disciplinary measures versus clinical or other interventions, and the impact of disciplinary measures on the health and well-being of inmates with disabilities.

2. The County shall develop policies and procedures on the consideration of mental health input in the disciplinary process.

3. In cases where an inmate with SMI, with an intellectual disability, or who is exhibiting unusual or bizarre behavior may face a disciplinary sanction, including denial of property or privileges, placement in restrictive housing, or lockdown for any period of time, a Qualified Mental Health Professional shall complete a Mental Health/Disciplinary Recommendation Form and provide written findings as to:

    a) Whether or not the reported behavior was related to mental illness, adaptive functioning deficits, or other disability;

    b) Any other mitigating factors regarding the inmate's behavior, disability, and/or circumstances that should be considered, and whether certain sanctions should be avoided in light of the inmate's mental health or intellectual disability, treatment plan, or adaptive support needs.

4. Staff shall meaningfully consider the Qualified Mental Health Professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed.

5. Staff shall meaningfully consider the Qualified Mental Health Professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs.

6. If custody staff do not follow the mental health input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, staff shall explain in writing why it was not followed.

7. Inmates shall not be subjected to discipline in any manner that prevents the delivery of mental health treatment or adaptive support needs.

8. Inmates shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior.

9. The County shall provide reasonable accommodations during the disciplinary process for inmates with mental health or intellectual disabilities.

10. The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to inmates with disabilities at all stages of the disciplinary process.

11. The County shall designate a supervisory-level custody staff member who shall be responsible for ensuring consistency in disciplinary practices and procedures.  The County shall track and monitor this process, including the frequency that the recommendation of the Qualified Mental Health Professional was followed.

G.  **Seclusion and Restraint**

1. The County affirms that it will not utilize clinical restraints or clinical seclusion at the Jail, except as consistent with involuntary medication court orders for people adjudicated to be Incompetent to Stand Trial who participate in any implemented in-jail restoration of competency treatment services program.

H.  **Discharge and Reentry Services**

1. Inmates on the mental health caseload shall receive discharge planning that is documented. Such planning will be enhanced, as defined by policy, for inmates with SMI and/or meeting criteria for placement in the specialized mental health units.

2. Discharge plans shall include assistance with application for public benefits and social services, outpatient referrals and appointments, medical insurance, housing, substance abuse treatment, parenting and family services, inpatient treatment, and other reentry services.

3. The County will ensure that inmates taking prescribed psychiatric medications have continuity of medications, and arranging follow-up appointments with providers.

4. The County shall track the elements of discharge planning for Continuous Quality Improvement purposes. Data shall include at least the following:

   a) The total number of inmates with SMI and/or meeting criteria for placement in the specialized mental health units who are eligible for discharge planning per month.

   b) The number of those inmates with SMI and/or meeting criteria for placement in the specialized mental health units who have

received referrals for outpatient appointments, discharge medications, 5150 referrals, and other aspects of reentry services completed by the mental health care staff.

I.  **Cross-Agency Coordination of Mental Health Treatment and Service Need**

1.  The County has begun to conduct monthly Medical Administration Committee meetings, with a portion of such meetings dedicated to discussion of the treatment of Jail inmates with mental illness, to include other relevant county agencies (e.g. Behavioral Wellness). The County agrees to continue such meetings, with additional cross-agency coordination as needed to address individual and systemic issues related to inmates with mental health treatment and service needs.

2.  The County shall develop a process to ensure timely referrals to and placements in inpatient care and other higher level mental health care outside the facility.

3.  The County shall make best efforts to expedite court referrals to the State Hospital system or other treatment facilities.

4.  The County shall track and monitor the number of referrals to mental health services and facilities outside of the jail, shall track and monitor the amount of time to provide services pursuant to those referrals, and shall identify and remedy causes of delay or other identified issues.

5.  The County shall implement a policy that ensures that inmates on the mental health caseload returning from outside facilities receive timely placement in appropriate housing, continuity of medication, and timely face-to-face clinical review to ensure continuity of care and reduce the risk of decompensation cycling.

J.  **Continuous Quality Improvement**

1.  The County has implemented a Continuous Quality Improvement meetings, which are modeled after J-A-06 Continuous Quality Improvement Program Standard[2] or a similar standard.

---

[2] Standards for Health Services in Jails 2008, Essential Standard J-A- 06 Continuous Quality Improvement Program, p.10. National Commission on Correctional Healthcare 2008

2.  The County shall develop quality indicators for purposes of
    monitoring a private mental health care contract. The County shall
    implement a detailed tracking system that parallels the scope of
    contractor work requirements to ensure that the contractor is
    meeting the requirements of the contract. For example, the County
    requires Service Level Agreements with clear mental health service-
    related performance indicators of the contracted health care
    provider, to be updated and reviewed annually or more often if
    warranted.

3.  The Quality Improvement process studies shall include (a) a clearly
    articulate hypothesis and methodology to determine if standards
    have been met; (b) data collection; (c) analysis of data to identify
    trends and patterns; (d) analysis to identify the underlying causes of
    problems; (e) development of remedies to address problems that are
    identified; (f) a written plan that identifies responsible staff and
    establishes a specific timeline for implementation of the remedy; (g)
    follow-up data collection; and (h) analysis to determine if the
    remedies were effective.

4.  The County shall conduct periodic quality improvement reviews of
    the intake process to ensure that staff are accurately recording intake
    information and making appropriate referrals.

5.  The County shall maintain lists of all inmates referred to a higher
    level of mental health care with sufficient information to complete
    periodic quality reviews.

6.  The County shall track the number of inmates on the mental health
    caseload, the number of inmates with SMI, the number of inmates
    awaiting court-ordered psychiatric facility placement, the number of
    inmates referred and found appropriate for inpatient (acute) and
    enhanced (sub-acute/residential) mental health treatment, and the
    number of inmates with SMI in restrictive housing units.

7.  The County shall develop a system to log inmate requests, including
    a log of inmates referred for placement on the mental health
    caseload from booking. These logs shall be available for auditors to
    complete randomized studies of the referral process via the CQI
    Committee or the assignment of a subject matter expert under a legal
    agreement.

8. The County shall conduct periodic quality reviews to assess whether:

   a) Health service requests are retrieved in a timely manner;

   b) Health service requests are triaged within the established timeframe;

   c) A proper level of triage is assigned, based on the nature of the request;

   d) Mental health staff appropriately resolved the request; and

   e) Mental health staff resolved the request in a timely fashion.

9. The County shall monitor the frequency of psychiatric follow-up appointments as a quality measure to ensure that inmates have adequate access to the prescriber.

10. Continuous Quality Improvement studies, data, and related materials will be made available to Plaintiffs and the subject matter expert during the period of implementation and monitoring.

## IV. SUICIDE PREVENTION

### A. Overview

1. The County shall develop and implement its own Suicide Prevention Policy, which shall set forth clear procedures consistent with the provisions set forth below.

### B. Screening for Suicide Risk

1. The County shall ensure that its intake assessment procedures timely identify acute and high-risk mental health conditions, including:

   a) Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs;

   b) Any prior suicidal ideation or attempts, self-harm, mental health treatment, or hospitalization;

   c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;

   d) Other relevant suicide risk factors, such as:

        (1)  Recent significant loss (job, relationship, death of family member/close friend);

        (2)  History of suicidal behavior by family member/close friend;

        (3)  Upcoming court appearances;

    e)  Transporting officer's impressions about risk.

2.  Regardless of the prisoner's behavior or answers given during intake screening, a mental health referral shall always be initiated if there is a history related to suicide or self-harm.

3.  When a prisoner refuses to respond to assessment questions, staff shall complete the intake screening, including the mental health and suicide risk assessments, to the maximum extent possible.  For example, staff will still complete the records/history review, if applicable, as well as the assessment of the individual's presentation and behaviors, and shall make appropriate mental health referrals when indicated.

4.  Any prisoner expressing current suicidal ideation and/or current suicidal/self-injurious behavior shall be designated as an emergent referral, immediately referred to mental health staff, and placed in a safe setting pending the mental health contact.

5.  Mental health clinicians shall complete and document a suicide risk assessment, with the use of suicide risk assessment tool, as close to placement on suicide watch as possible and upon discharge to a lower level of observation.

**C.  Housing of Prisoners on Suicide Precautions**

1.  The County's policy and procedures shall ensure that prisoners, including those identified as being at risk for suicide, are housed and treated in the least restrictive setting appropriate to their individual clinical and safety needs.

2.  Prisoners on psychiatric observation for suicide risk shall be housed and monitored in a setting appropriate for their clinical needs.

3.  No prisoner shall be housed in a safety cell for more than twenty-four (24) hours, unless there are exceptional circumstances documented by clinical and custody staff.  Within twelve (12) hours

of safety cell placement, the County shall refer the patient to behavioral health for inpatient placement evaluation.

4.   The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in an acute care unit as soon as possible. A patient showing no improvement or continuing deterioration after 12 hours shall be transferred to an inpatient mental health facility or hospital for evaluation and treatment.  In all other cases, after 24 hours of being housed in a safety cell, the patient shall be transferred to an appropriate inpatient mental health setting or hospital, absent exceptional circumstances documented by clinical and custody staff.

D.   **Treatment and Conditions for Individual Prisoners on Suicide Precautions**

1.   The County shall provide at least one daily mental health professional contact, or more as clinically indicated, for any prisoner who is identified as a current suicide risk.  The clinical contact shall be conducted in a space with sound privacy unless there are current, specific safety concerns that are documented, with supervisory-level review and approval.

2.   The Jail's qualified mental health professionals shall provide input with respect to the provision of property and privileges for prisoners on suicide precautions.  Custody staff may remove property/privileges, if necessary, prior to the mental health staff evaluation of a prisoner identified as at risk. Once the mental health evaluation occurs, the qualified mental health professional and custody staff shall determine, based on clinical judgment and on a case-by-case basis, the removal and/or return of property (e.g., clothing, books, footwear, eyeglasses) and privileges.  The removal of property/privileges shall be documented with clinical justification in the health record, and shall be reviewed on a regular basis to ensure restoration of property/privileges as soon as appropriate.

3.   Safety cells shall be sanitized after every use and the sewer grate inspected to ensure cleanliness and appropriate conditions.

4.   The County shall provide clinically-indicated therapeutic services, including psychiatric services, to prisoners on suicide precautions or otherwise identified as at elevated risk of suicide.  The County shall provide prisoners on suicide precautions or otherwise identified as at

elevated risk of suicide with appropriate individual counseling and medication review in a confidential setting.

E.  **Supervision/Monitoring of Suicidal Prisoners**

1.  The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two levels of observation:

    a)  Close observation shall be used for prisoners who are not actively suicidal but require enhanced observation to ensure safety.  Staff shall observe the prisoner at staggered intervals not less than every 15 minutes and shall document the observation as it occurs.

    b)  Constant observation shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, and considered a high risk for suicide.  An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis.  The observation should be documented at 15-minute intervals.  Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.

2.  For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances.  Placement in a safety cell shall not serve as a substitute for the clinically-determined level of monitoring.

3.  Video monitoring of prisoners on suicide precaution shall not serve as a substitute for the clinically indicated level of observation.

F.  **Discharge from Suicide Precautions and Follow-Up**

1.  A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions.  Such assessment shall be conducted in a space with sound privacy unless there are current, specific safety concerns that are documented.

2.  Qualified mental health professionals shall provide, and update as clinically appropriate, individualized treatment plans for all prisoners discharged from suicide precautions.  The treatment plan shall describe signs, symptoms, and circumstances in which the risk

of suicide is likely to recur, how recurrence of suicidal thoughts can
be avoided, appropriate individualized treatment interventions, and
actions the patient or staff can take if suicidal thoughts do occur.

3. Qualified mental health professionals shall provide clinical input
regarding appropriate housing placement (*e.g.*, whether isolation is
contraindicated for the prisoner) upon discharge from suicide
precautions.  Custody and classification staff shall consider such
clinical input in determining post-discharge placement and
conditions of confinement, and document the reasons when clinical
input is not followed.  Once clinically discharged from suicide
precautions, the prisoner shall be promptly transferred to appropriate
housing.

4. Prisoners discharged from suicide precautions shall remain on the
mental health caseload and receive regularly scheduled clinical
assessments and contacts.  A qualified mental health professional
shall provide, at a minimum, clinical follow-up assessment and
contacts within 24 hours of discharge, and again within one week of
discharge, and more often as clinically indicated.

G.  **Emergency Response**

1. The County shall keep an emergency response bag that includes
appropriate equipment, including a first aid kit, CPR mask or Ambu
bag, and emergency rescue tool in close proximity to all housing
units.  All custody and medical staff shall be trained on the location
of this emergency response bag and shall receive regular training on
emergency response procedures, including how to use appropriate
equipment.

2. The County shall ensure that all emergency response equipment at
the jail is inspected monthly and after each use and is repaired and
replaced as needed.  The County shall ensure that the jail maintains
a service log for all emergency response equipment.

3. It shall be the policy of the County that any staff who discovers a
prisoner attempting suicide shall immediately respond and alert
other staff to call for medical personnel. Trained staff shall
immediately begin to administer standard first aid and/or CPR, as
appropriate.

H.  **Continuous Quality Improvement**

1.  The County shall track all critical incidents which include prisoner
    suicides, attempted suicides, and incidents involving serious self-
    harm.  The County shall review critical incidents and related data
    through its quality assurance and improvement processes.

2.  For each serious suicide attempt (*e.g.*, requiring hospital admission),
    the County shall conduct a multidisciplinary (mental health,
    medical, and custody) review of: 1) the circumstances surrounding
    the incident; 2) the procedures relevant to the incident; 3) relevant
    training received by involved staff; 4) pertinent medical and mental
    health services/reports involving the victim; and 5) possible
    precipitating factors that may have caused the victim to commit
    suicide or make a serious suicide attempt.  The review team shall
    generate written recommendations (as appropriate) for changes in
    policy, training, physical plant, medical or mental health services,
    and operational procedures.

3.  The County shall implement a continuous quality assurance/quality
    improvement plan to periodically audit suicide prevention
    procedures that include, but are not limited to: intake screening (to
    include audits to ensure that staff ask and record all suicide
    screening questions), mental health and suicide risk assessments,
    crisis response, treatment plans/behavior management plans, and
    post-suicide watch clinical follow-up assessment and contacts.

V.  **DISABILITY ACCOMMODATIONS AND ACCESS, AMERICANS
    WITH DISABILITIES ACT (ADA)**

A.  **Policy**

1.  It is the County's policy to provide access to its programs and
    services to incarcerated people with disabilities, with or without
    reasonable accommodations, consistent with legitimate penological
    interests. No person with a disability, as defined in 42 U.S.C. §
    12102, shall, because of that disability, be excluded from
    participation in or denied the benefits of services, programs, or
    activities or be subjected to discrimination. It is the County's policy
    to provide reasonable accommodations or modifications, consistent
    with 28 C.F.R. §§ 35.150 & 35.152, and other applicable law.

B. **ADA Coordinator**

1. The County shall have a designated Americans with Disabilities Act (ADA) Coordinator whose position is dedicated to coordinating efforts to comply with and carry out ADA-related requirements and policies. The ADA Coordinator shall have sufficient authority to carry out such duties, and shall work with the executive management team regarding ADA compliance, training, and program needs.

2. The County intends for the ADA Coordinator to be based at the Main Jail. Any County jail facility that does not have the ADA Coordinator on site shall have a designated staff member on site at that facility who will have responsibility to monitor day-to-day ADA compliance and will report to the ADA Coordinator.

3. The County shall clearly enumerate the job duties and training requirements for the ADA Coordinator position.

4. The County will ensure that the name of and the method for people to contact the ADA Coordinator (or facility designee) are clearly posted in the intake area and in every jail housing unit. The County will also ensure that the name and contact information (address, phone, email) of the ADA Coordinator (or facility designee) are available to the public, including posting in each jail's main lobby and online.

C. **ADA Notice to Prisoners**

1. The County shall ensure that people with disabilities held at the Jail are adequately informed of their rights, including but not limited to:

   a) The right to receive reasonable accommodations;

   b) The process for requesting a reasonable accommodation;

   c) The role of the ADA Coordinator (and designee) and method to contact them;

   d) The grievance process, location of relevant forms, and process for getting assistance in completing request and grievance forms;

   e) Instructions on how to request and access health care services, including the provision of Effective Communication and other accommodations in accessing those services.

2.   Within 6 hours of processing and classification, the County will
provide all incarcerated people a Custody Operations Orientation
Handbook in an accessible format, containing a designated section
with ADA-related policies, procedures, and other information.  The
Orientation Handbook shall be made available in large print (at least
18-point font) in English and Spanish to accommodate people with
visual impairments.

3.   The County will provide an accessible video that presents the
contents of the Orientation Handbook, including the ADA-related
policies, procedures and information.  The County will, as
appropriate, provide an SLI to interpret the contents of the
Orientation Handbook to persons who are deaf or hard of hearing
who use American Sign Language as their primary means of
communication.

D.   **Staff Training**

1.   The County shall ensure all custody, health care, facility
maintenance, and other Jail staff receive ADA training appropriate
to their position. The County shall provide training to all staff during
the academy and at least bi-annually thereafter on:

a)   Disability awareness, including the use and purpose of
accommodations and modifications in accordance with the
ADA;

b)   Use of force when interacting with people with disabilities.

2.   Staff ADA training shall include formalized lesson plans and in-
classroom or virtual training for all staff provided by qualified ADA
instructors.

E.   **ADA Tracking System**

1.   The County shall, in consultation with Plaintiffs' counsel, develop
and implement a comprehensive, standardized electronic system
("ADA Tracking System") to track people with disabilities and their
accommodation and Effective Communication needs.

2.   The ADA Tracking System shall identify for each prisoner, as
appropriate:

a)   Any disabilities and related health conditions;

b) Disabilities that may pose a barrier to communication, including but not limited to learning, intellectual, or developmental disabilities, and hearing, speech, or vision impairments;

c) Accommodation needs, including as to housing, classification, transportation, Effective Communication, adaptive supports, and health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME);

d) Class membership in *Armstrong v. Newsom* (N.D. Cal. No. 94-cv-02307) (*i.e.*, people held in the Jail related to a parole revocation proceeding or term), with their applicable disability classification(s) and accommodation need(s).

3. The ADA Tracking System's prisoner disability information will be readily available to custody, medical, mental health, and other staff at the Jail to ensure appropriate accommodations and adequate program access for people with disabilities. Health care staff, the ADA Coordinator, and any ADA Coordinator-designee shall have the ability to input information into the ADA Tracking System in real time.

4. The County will print a prisoner's disability accommodation need(s) on the person's wristband.

5. Staff shall check the ADA Tracking System for each prisoner, and document that check, immediately prior to:

a) Intake screening;

b) Classification interview;

c) Assignment of housing;

d) Assignment of programs;

e) Medical and mental health encounters;

f) All due process proceedings, including but not limited to, resolving grievances and disciplinary infractions;

g) All trips to court or outside health care appointments.

F. **Screening for Disability and Disability-Related Needs**

1. The County shall take steps to identify and verify each person's disability and disability-related needs, including by screening them

for disabilities during medical intake and classification. The County shall ensure that all private health care and other service providers implement any policies and procedures needed to facilitate full implementation of these provisions.

2.  The County, in consultation with subject matter experts and Plaintiffs' counsel, shall revise its ADA screening process to ensure consideration of:

    a)  The individual's self-identification or claim to have a disability;

    b)  Documentation of a disability in the individual's health, custody, and any other available records;

    c)  Staff observation that the individual may have a disability that affects placement, program access, or Effective Communication; and

    d)  The request of a third party (such as a family member) for an evaluation of the individual for a possible disability.

3.  The County shall ensure that ADA screening results are promptly entered in the ADA Tracking System.

G.  **Disability-Related Requests and Grievances**

1.  The County shall revise its ADA Request Form to contain an explanation of how to appeal a denial of accommodations.

2.  The County shall provide a grievance procedure for people with disabilities to appeal any denial of an accommodation, and to report any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy.

3.  The County shall ensure that people who are Deaf or hard of hearing are interviewed and provided a qualified SLI as part of the grievance/appeal process.

4.  To ensure that ADA accommodations requests and ADA grievances are promptly addressed, the County shall:

    a)  Respond to an individual's Request for Accommodations within 72 hours of receipt;

    b)  Respond to an ADA-related grievance within 72 hours of receipt;

    c)  Establish an expedited process for urgent ADA requests and grievances (*e.g.*, situations in which a person's safety or physical well-being is at risk); and

    d)  Allow each person to retain accommodation(s) they possess at the time of arrival at the Jail, or that they have been previously provided by the Jail, pending review of a grievance/appeal regarding the denial or removal of such accommodation(s), absent an individualized security concern that is documented.

5.    The County shall ensure that grievance forms contain an "ADA" box to indicate that a particular grievance relates to a disability-related issue. The County will ensure that disability-related grievances are so identified by the reviewing supervisor, even if the individual who submitted the grievance does not check the "ADA" box.

6.    The County will ensure that grievance forms are readily available and accessible to all prisoners at all times. Grievance forms shall be made available in large print (minimum 18-point font) to accommodate people with vision impairments.

7.    The County shall provide to the person with a disability a written grievance response, including the resolution, the basis for a denial (if applicable), and the process for appeal.

8.    The County shall take steps to ensure all prisoners are aware of the disability grievance procedures, including the availability of accommodations and staff assistance to submit a grievance and/or appeal.

9.    The County shall implement a specific tracking system regarding the submission, processing, and responses for disability-related grievances and complaints, and regularly review such information for quality assurance purposes.

## H.  Housing Placements

1.    The County shall implement a housing assignment system that includes an individualized assessment to be completed by health care staff, the results of which shall be documented in the ADA Tracking System, of each person's functional limitations and restrictions, including but not limited to:

    a)  The need for a lower bunk;

b)  The need for grab bars in the cell and/or shower;

c)  The need for accessible toilets;

d)  The need for no stairs in the path of travel; and

e)  The need for level terrain.

2.  People with disabilities shall be housed in the Jail consistent with their individual security classification. Classification staff shall not place prisoners with disabilities in: (a) inappropriate security classifications because no ADA-accessible cells or beds are available; (b) designated medical areas unless the prisoner is currently receiving medical care requiring such placement; or (c) any location that does not offer the same or equivalent programs, services, or activities as facilities where they would be housed absent a disability.

I.  **Visitation**

1.  The County shall ensure that family/personal and professional visitation areas are accessible for people with disabilities and visitors.

2.  The County shall perform an individualized assessment as needed and shall ensure that people with disabilities have full access to visitation at the Jail.

J.  **Access to Programs, Services, and Activities**

1.  The County shall ensure people with disabilities, including those housed in specialty health care units, have equal access to programs, services, and activities available to similarly situated people without disabilities, consistent with their health and security needs. The County shall ensure that staff provide appropriate assistance to people with disabilities as needed to ensure equal access to programs, services, and activities provided at the Jail.  Such programs, services, and activities include, but are not limited to:

a)  Educational, vocational, reentry and substance abuse programs

b)  Work Assignments

c)  Dayroom and other out-of-cell time

d)  Outdoor recreation (including accessible exercise equipment)

e)  Structured programming (including in-cell activities)

     f)   Showers

     g)   Telephones and/or videophones

     h)   Reading materials (including easy reading, large print books and other materials accessible to people with a vision-related disability)

     i)   Religious services

     j)   Family/personal and professional visits

     k)   Medical, mental health, and dental services and treatment

2.   The County's policy shall include the provision of assistance in reading or scribing legal documents, sick call requests, grievances, documents related to disciplinary procedures, and documents related to health care encounters.

3.   The County shall ensure equitable work opportunities for people with disabilities, including by ensuring: (a) clear job duty statements, with essential functions and specific criteria, for each worker position; and (b) that health care and other relevant staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations to facilitate appropriate work/industry assignments, to ensure reasonable accommodations, and to prevent improper exclusions from work opportunities.

## K.  Health Care Appliances, Assistive Devices, Durable Medical Equipment

1.   The County shall establish a written policy to ensure the timely provision of safe and operational HCA/AD/DME to people with a disability based on an individualized assessment by medical staff, with a process for timely repair and replacement of such devices as needed.

2.   A person's request for a particular device or other accommodation shall be given primary consideration and shall be granted unless the request is unreasonable for specific, articulated reasons allowable under the ADA, or unless other effective accommodations are available.

3.   The County shall allow people to retain personal HCAs/ADs/DME (including mobility devices, glasses, and hearing aids), unless there

is an individualized determination that doing so would create an articulated safety or security risk.

    a) Where Jail staff determine it is necessary to remove personal HCA/AD/DME for security reasons, the County shall provide an equivalent Jail-issued device unless custody staff, with ADA Coordinator approval, determine and document, based on an individualized assessment, that the device constitutes a risk of bodily harm or threatens the security of the facility.

    b) If such a determination is made, the ADA Coordinator shall document the decision and reasons for it and shall consult with medical staff to determine an appropriate alternative accommodation.

4. The County shall implement a written policy governing the release of people who need assistive devices.

    a) The County will ensure that any personal mobility device belonging to a person is returned prior to release.

    b) If a person does not have a personal mobility device, but is ambulatory with the assistance of a cane, crutch, or walker, the prisoner will be permitted to retain such device that was used while in custody upon release, or will be provided a comparable device, upon release.

    c) If a person who is due for release requires a wheelchair, but does not have a personal wheelchair, Jail staff shall coordinate with the prisoner, family or friends, and other County agencies as needed to secure a wheelchair or take other steps to address the individual's needs upon release. The County shall document this process in the ADA Tracking System for purposes of individual tracking and quality assurance.

L. **Transportation**

1. The County shall provide reasonable accommodations for people with disabilities when they are in transit, including during transport between facilities, to and from court, or to and from outside health care services.

2. Prescribed HCAs/ADs/DME for people with disabilities, shall be available to them at all times during the transport process, including in temporary holding cells.

3.    The County shall maintain a sufficient number of accessible vehicles to ensure timely transport of people with disabilities that require special transportation.  The County intends for all transport vehicles to be accessible.

4.    Staff will provide assistance to people with mobility or other disabilities where necessary to ensure safe access on and off of transport vehicles.

M.  **Effective Communication**

1.    The County shall develop and implement a Custody Operations policy to ensure that people with disabilities receive accommodations and services necessary to provide Effective Communication, consistent with the provisions set forth herein.

2.    The County shall assess all people detained at the Jail for any period of time for Effective Communication needs and take steps to provide Effective Communication based on individual need.  The County shall ensure that Jail custody and health care policies and procedures contain sufficient guidance on the provision of Effective Communication.

3.    The County shall ensure that appropriate staff assess individual Effective Communication needs at the beginning of the medical intake screening and at the beginning of the classification screening, to facilitate Effective Communication throughout those and all subsequent processes.

4.    Enhanced procedures for the provision of Effective Communication, as described in the paragraph below, shall apply in the following situations:

    a)  Due Process Events, including the following:

        i.   Classification processes

        ii.  Disciplinary hearing and related processes

        iii. Service of notice (to appear and/or for new charges)

        iv.  Release processes

        v.   Probation encounters/meetings in custody

    b)  Clinical Encounters, including the following:

      i.   Determination of medical history or description of ailment or injury

      ii.   Diagnosis or prognosis

      iii.  Medical care and medical evaluations

      iv.  Provision of mental health evaluations, rounds, group and individual therapy, counseling and other therapeutic activities

      v.   Provision of the patient's rights, informed consent, or permission for treatment

      vi.  Explanation of medications, procedures, treatment, treatment options, or surgery

      vii. Discharge instructions

5. In the situations described in the previous paragraph, Jail staff shall:

   a) Identify each person's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s);

   b) Provide effective reasonable accommodation(s) to overcome the communication barrier; and

   c) Document the method used to achieve Effective Communication and how the staff person determined that the person understood the encounter, process, and/or proceeding.

6. In determining what auxiliary aid or service to provide, the County shall give primary consideration to the request of the person with Effective Communication needs.  Such aids may include bilingual aides, SLIs, readers, sound amplification devices, captioned television/video text displays, Videophones and telecommunication services for deaf persons, audiotaped texts, Braille materials, large print materials, writing materials, and signage.

7. The County shall ensure that all outside education, program, and service providers at the Jail provide Effective Communication for people participating in such programs.

N.  **Access for Individuals with Hearing Impairments**

1.  The County shall develop and implement a policy for newly arrived and newly identified people with hearing disabilities to determine each person's preferred method of communication.

2.  Qualified Sign Language Interpreters (SLIs), on-site or through a VRI service, will be provided during intake and for due process functions, health care encounters, and Jail programming, when sign language is the person's primary means of Effective Communication, unless the person waives the assistance of an interpreter and/or delay would pose an urgent safety or security risk

3.  The County will maintain a log of (a) when, for whom, and for what purpose an SLI was used; and (b) when, for whom, and why an SLI was not used for a person with an identified need for SLI services (e.g., waived or delay would have posed urgent safety or security risk).

4.  When a prisoner waives an SLI, the log must document (a) the method of communication of the waiver, and (b) the method staff used to determine that the waiver was knowing and freely given.

5.  The County shall maintain a contract or service agreement with interpreter services, including a VRI service, in order to provide such services for deaf or hard of hearing prisoners. The County will ensure that appropriate Jail staff have sufficient guidance regarding use of such services.

6.  Lip reading will not be the sole method of Effective Communication used by staff, unless the person indicates that is their preferred method of communication.

7.  In cases where the use of an SLI is not practicable, or is waived by the prisoner, Jail staff shall employ the most effective form of communication available.

8.  The County shall make videophones available for deaf and hard of hearing people. The videophones shall provide for calls that utilize Video Relay Services (VRS) at no cost to deaf and hard of hearing prisoners, or for calls directly to another videophone.

9.  The County shall provide deaf/hard of hearing people with twice as much time for calls using telecommunication relay services, such as a videophone or TDD/TTY, to account for the fact that such

conversations take longer than spoken conversations. The County shall document the time that each prisoner uses and has access to such equipment.

10. People who require an SLI as their primary method of communication shall be provided an SLI for education, vocational, and religious programs.

11. In housing units where an individual with a hearing-related disability resides, public announcements shall be communicated as consistent with individual Effective Communication needs. This includes announcements regarding visiting, meals, recreation release and recall, count, lock-up, and unlock. Verbal announcements may be effectively communicated via written messages on a chalkboard or dry erase board, or by personal notification, as consistent with individual need. These procedures shall be communicated to people during the orientation process and shall be incorporated into relevant policies and post orders.

O.  **Prisoners with Intellectual/Developmental Disabilities**

1. The County shall develop and implement a comprehensive written policy and procedure regarding people with Intellectual and/or Developmental Disabilities, including:

   a)  Screening;

   b)  Identification of their adaptive support needs and adaptive functioning deficits; and

   c)  Monitoring, management, and accommodations for people with Intellectual or Developmental Disabilities.

2. If a person is known to have or suspected of having an Intellectual or Developmental Disability, the County shall contact the appropriate Regional Center within the next business day of the person's arrival at the Jail. The County shall request the prisoner's current IPP (Individualized Program Plan), with the individual's authorization. Once received, medical and custody staff shall review the IPP to ensure that all communications and services being provided are appropriate. If the person is not a Regional Center client, the County shall request that the Regional Center (or other appropriate agency) perform an evaluation. Whenever possible, Jail staff will work with the Regional Center and any relevant County

agencies to move a person with an identified Intellectual or Developmental Disability out of custody and into a setting with appropriate supports to meet the person's individual needs.

3. People identified as having an Intellectual or Developmental Disability will be provided with accommodations tailored to their needs, which may include but are not limited to communications at the appropriate comprehension level, more time to complete directions, and specific behavioral supports.

4. A multidisciplinary team that includes appropriate health care staff will monitor and ensure appropriate care for people with an Intellectual or Developmental Disability. The multidisciplinary team will develop an individualized plan for each person with an Intellectual or Developmental Disability, which addresses: (1) safety, vulnerability, and victimization concerns, (2) adaptive support needs, and (3) programming, housing, and accommodation needs. The multidisciplinary team's plan will be regularly reviewed and updated as needed.

P. **Physical Accessibility Requirements**

1. The County shall implement an ADA transition plan to remedy Main Jail physical plant features that could result in access barriers for people with disabilities.

2. The above ADA transition plan will be implemented in the timeframe set forth in the Stipulated Judgment.  The County and the Sheriff's Office agree that, during the period of implementation of the ADA transition plan at the Main Jail, they will take all reasonable steps to promote and ensure accessibility for people with disabilities to the maximum extent possible.  This includes the use of interim measures to address existing access barriers in order to ensure safety and program access for people with disabilities.

3. The County shall ensure that the North Branch Jail provides adequate accessibility for people with disabilities, consistent with accessibility requirements under federal and state law.

Q. **Alarms/Emergencies**

1. The County shall implement written policies regarding the expectations of staff as to persons with disabilities during emergencies and alarms, including as to disabilities that may affect

their ability to comply with orders or otherwise respond to emergencies and alarms. For example, the policies shall ensure appropriate handling of people with mobility-related disabilities who are unable to prone out or take a seated position on the ground during an alarm or emergency. Such policies shall be communicated to staff, incorporated into the relevant policies, and communicated to people with disabilities using Effective Communication.

2. In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, individuals who have disabilities visible markers to identify their disability needs (e.g., wristbands). The County shall maintain a list, posted in such a way to be readily available to Jail staff in each unit, of people with disabilities that may require accommodations during an alarm or emergency.

3. The County shall install visual alarms appropriate for people who are deaf or hard of hearing.

4. All housing units shall post notices for emergency and fire exit routes.

R. **Quality Assurance**

1. The County shall develop and implement written policies and procedures regarding monitoring compliance with ADA requirements and Jail ADA policies, including (but not limited to) the following:

   a) Requests for ADA accommodations;

   b) ADA-related grievances;

   c) ADA-related training;

   d) Use of the ADA Tracking System.

2. The County shall develop an ADA accountability plan that will ensure quality assurance, track violations of the ADA and the Jail's ADA policies, and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures.

## VI. ENVIRONMENTAL HEALTH AND SAFETY

### A. Environmental Health and Safety Monitor

1. The County shall designate an environmental health and safety monitor ("Environment of Care Monitor") responsible for ensuring compliance with this Remedial Plan and other environmental health and safety policies and procedures. The duties of the Environment of Care Monitor will be established in writing consistent with this remedial plan.  The Environment of Care Monitor will have sufficient authority to carry out such duties.

### B. Cleanliness and Sanitation of Jail Facilities

1. The County shall establish a sanitation plan to ensure that all Jail facilities maintain appropriate cleanliness. The plan shall provide for any cleaning issues requiring an established cleaning schedule and written documentation of such cleaning, including, at a minimum:

   a) Daily access to supplies and equipment for prisoners to conduct cleaning and disinfection of housing units, including floors, toilets, sinks, and showers, with a cleaning chemical that sufficiently eliminates pathogens found in living and common areas;

   b) Weekly inspections of housing units, including floors, toilets, sinks, and showers by jail staff, with prompt steps to address identified cleaning and disinfection needs;

   c) Daily cleaning of intake, health care clinics, kitchen, laundry and other common areas, such as hallways and the tunnel;

   d) Weekly cleaning of visitation rooms and classrooms, and more frequently as needed;

   e) Biweekly (*i.e.*, every other week) power washing of shower areas;

   f) Weekly cleaning of cell bars, windows, and lights;

   g) Quarterly cleaning of fans and air vents, and more frequently as necessary to ensure that they are clean and free of mold, mildew, and/or accumulation of dirt and dust.

2. Upon intake, the County shall provide prisoners an orientation regarding the Jail's expectations and procedures for cleanliness,

elimination of clutter, and proper use of personal property containers.

3. The County shall establish a procedure to maintain cleanliness in housing areas where a prisoner is unable or unwilling to adequately clean. Where prisoners are expected to participate in cleaning, staff shall ensure appropriate assistance to people with mental illness, intellectual and developmental disabilities, or other special needs.

4. The County shall develop and implement a policy and procedure for effective cleaning, disinfection, distribution, and repair of mattresses. The policy shall provide a process for inspection and replacement of all frayed and cracked mattresses that cannot be disinfected sufficiently to eliminate harmful bacteria.

5. The County shall ensure that newly arrived prisoners receive a clean and serviceable mattress. Mattresses shall be cleaned and disinfected anytime they are assigned to a different prisoner or when there is a biohazardous or bloodborne incident involving the mattress.

6. The County shall establish procedures so that a cell is cleaned prior to a prisoner's placement in that cell.

7. The County has committed to ensuring that each prisoner is assigned and provided a bed, as set forth in the Custody Operations/Segregation Remedial Plan. Until such remedial provision is fully implemented, where the County uses plastic beds, or "boats," the County shall ensure that they are cleaned and disinfected anytime they are assigned to a different prisoner or when there is a biohazardous or bloodborne incident involving the mattress or boat.

C. **Laundry**

1. Clothing and linen exchange shall occur for all prisoners at least weekly, and more frequently when circumstances warrant. Kitchen workers shall be provided a clean kitchen uniform daily. Whenever a prisoner presents to jail staff clothing or linen that are soiled and/or reasonably requests a clothing/linen exchange, jail staff will ensure a prompt exchange, in all cases by the end of the shift.

2. The County shall provide, document and maintain records of training provided to prisoner-workers and staff assigned laundry

duties on chemical safety, biohazardous and bloodborne contaminated clothing and linens, use of personal protective equipment, and Material Safety Data Sheets.

3. Staff shall make reasonable efforts to ensure that all prisoners have clean linens at all times.  Staff will make a health care referral for any prisoner refusing to exchange linens if there is reason to believe such refusal relates to the person's mental health condition. Mental health staff shall assist in resolving the situation, as appropriate.

D. **Food Service and Kitchen Operations**

1. Prisoners assigned to kitchen duties shall be provided with clean outer clothing daily. If during a prisoner's work shift the clothing becomes soiled, it should be replaced promptly.

2. The County shall perform a weekly inspection of kitchen operations, with a report submitted to the Environment of Care Monitor, and shall ensure actions are taken to correct any identified issues.

3. The County shall develop and implement policies and procedures for food service and kitchen operation as required in Section 1246 of California Code of Regulations Title 15. The policy shall include provisions for tool control, roles and responsibilities of Jail staff and the food service Contractor, employee and prisoner-worker training in food safety, and temperature monitoring. The policy shall provide that prisoner-workers are medically screened prior to being assigned to work in the kitchen.

4. The County shall provide prisoner-workers with training and education regarding kitchen operations.

5. The County shall conduct periodic temperature monitoring of food and take steps to ensure that food prepared as hot is served hot to the greatest extent practicable.

E. **Work Order System and Preventative Maintenance**

1. The County shall train staff on the process of submitting work orders.

2. The County shall utilize the work order reporting system to schedule preventative maintenance and repairs. The system shall provide for any cleaning or maintenance requiring an established schedule, including, at a minimum

a) Regular maintenance of plumbing;

b) Quarterly cleaning of fans and ventilation grills;

c) Quarterly replacement of ventilation filters;

d) Regular external contractor monitoring of negative pressure cells and gauges;

e) Monthly fire extinguisher inspections; and

f) Monthly fire and life safety inspections.

3. The County shall develop and implement an environmental inspection policy with procedures that include an assessment of maintenance issues for every housing unit, including for plumbing, electrical, ventilation, painting, cleanliness, lighting, and storage of personal belongings.

F. **Chemical Control and Biohazardous Materials**

1. The County shall develop and implement chemical control policies and procedures for safe storage, dilution, and distribution of chemicals used at the Jail.

2. The County shall develop and implement a chemical safety training for all staff and prisoners assigned the responsibility of cleaning. The County or County's contract provider shall maintain documentation that demonstrates evidence of training for all staff and prisoner-workers involved in cleanup.

3. The County shall revise and ensure implementation of its Communicable Disease policy, including to ensure appropriate use and concentration of pyrethrum spray.

4. The County shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, including waste. The County shall ensure that Material Safety Data Sheets are accessible anywhere chemicals are stored, mixed, or diluted.

5. The County shall ensure that staff and prisoner-workers responsible for cleaning biohazardous materials or areas suspected of being contaminated by pests (*e.g.* lice or scabies) are outfitted with protective equipment and receive appropriate supervision.

G.  **Negative Pressure Monitoring and Recording**

    1.  The magnehelic gauges located outside the housing area to any negative airflow cell shall be checked once per shift to ensure the cells remain in a negative airflow state. When non-conformities are identified, the cell shall not be used for people with circumstances requiring a negative airflow cell, and a work order shall be submitted for prompt repair.

    2.  The County shall provide and document training regarding acceptable gauge readings and the steps to take if the readings are outside the acceptable range for all staff assigned to housing areas with negative airflow cells.

    3.  Negative pressure cells and gauges shall be tested by an external contractor on a regular schedule as part of the Jail's preventive maintenance schedule.

H.  **Emergency Response and Fire/Life Safety**

    1.  The County shall inspect fire extinguishers monthly and hold drills to ensure all jail staff are trained consistent with NCCHC standards on emergency response. Drill documentation shall include start and stop times, the number and location of any prisoners moved as part of the drill, any noted deficiencies, and any corrective actions taken.

I.  **Environment of Care Monitor Inspections, Corrective Action, and Process for Prisoners to Raise Concerns**

    1.  The Environment of Care Monitor shall conduct bimonthly (*i.e.*, every other month) Environmental Health and Safety inspections in every housing unit. The inspections shall include a documented assessment of and (as needed) corrective action plans for:

        a)  Cleanliness of floors, walls, ceilings, bed and bedding, toilet and lavatory, cells and dayrooms surfaces;

        b)  Cleanliness and disinfection of common areas and furnishings, including showers, shower chairs, plastic chairs, wheelchairs, stretchers, beds/bunks and personal property containers.

        c)  Cleanliness of fans, exhaust and return ventilation grills, and the need for any maintenance repairs such as painting, broken tiles, blocked lighting, and plumbing.

2.   The County shall provide a system through which class members are able to raise sanitation matters of concern. The grievances shall be reviewed by the housing unit supervisors before each shift change. Where a maintenance issue is identified, a work order shall be submitted before the end of the following shift.

# VII. CUSTODY OPERATIONS/SEGREGATION

## A.   General Principles

1.   Prisoners shall be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff and other prisoners.

2.   The County shall not place prisoners in more restrictive settings, including Segregation, based on a mental illness or any other disability.  Prisoners will be housed in the most integrated setting appropriate to their individual needs.

3.   The County shall not place a prisoner in Segregation units without first determining that such confinement is necessary for security reasons and/or the safety of the staff or other prisoners. The County shall maintain a system by which it documents in writing the specific reason(s) for a prisoner's placement and retention in Segregation housing. The reason(s) shall be supported by clear, objective evidence.

4.   Prisoners will remain in Segregation housing for no longer than necessary to address the reason(s) for such placement.

## B.   Classification Procedures

1.   The County shall implement a validated Classification System consistent with the provisions of this remedial plan.

2.   The Classification System shall be based on clear criteria and procedures for placing prisoners in and removing prisoners from Segregation units.  Placement in and removal from Segregation units shall be documented for all prisoners.

3.   The Classification System shall facilitate the following:

a)   *Housing placements based on the behavior and clinical needs of prisoners who are identified as having Serious Mental*

*Illness.* Mental health staff shall provide input regarding the classification and placement of people with Serious Mental Illness.

    b)   *Screening to determine whether a prisoner should be separated from other prisoners for safety purposes.* Where a prisoner is found to require separation from other prisoners for safety, placement will be in the least restrictive setting appropriate, and will allow for out-of-cell and recreation time consistent with the provisions herein.

4.    The Classification System shall include a Classification Review Process.

    a)   The Classification Review Process shall include clear, written criteria by which prisoners in a Segregation Unit can secure placement in a less restrictive setting as well as restoration of property or privileges.  This review will include a private, out-of-cell interview (unless individual security issues prevent such an interview and are documented).  The review shall occur at least every 30 days or sooner if circumstances warrant.

    b)   If a prisoner is retained in a Segregation unit following the Classification Review, the reasons for retention and the specific steps to be taken to achieve restoration of property/privileges and transfer to a less restrictive setting will be documented.

    c)   Prisoners in Segregation units will be provided an oral and written statement of the reasons for the outcome of each review, including what steps are necessary to gain restoration of property/privileges and to be moved to a less restrictive setting.

5.    The County shall perform Prison Rape Elimination Act (PREA) screenings in a private location.

## C.  **Elimination of Dangerous or Improper Physical Plant Features**

1.    The County shall conduct an assessment of all Segregation cells and develop a plan to address structural suicide hazards, such as tie-off points within the cells, to the maximum extent feasible.

2.    The County shall ensure that prisoners with serious mental illness or otherwise at elevated risk of suicide will not be housed in a cell that

contains attachment points or other structural suicide hazards, as follows.

    a)  The County shall maintain a list of Segregation cells containing structural suicide hazards.

    b)  The County shall not place any person in a Segregation cell containing structural suicide hazards if the person has a diagnosed Serious Mental Illness.

    c)  The County shall assess all cells used to hold prisoners awaiting intake screening or post-intake housing placement, including as intake "overflow," and shall ensure that they are suicide-resistant and do not contain structural blind spots, to the maximum extent feasible.

3.   No later than January 1, 2021, the County shall discontinue its use of the Main Jail's "double door" or other extreme isolation cells, including Central 7 and Central 8.

4.   No later than January 1, 2021, the County shall discontinue its use of Segregation housing units that lack access to a dayroom, including South 1-16, West 18-29, and East 11-22.  The County may retrofit such units to ensure that they provide access to a dayroom and outdoor recreation areas and that they comply with contemporary correctional standards.

## D.  Minimum Out-of-Cell Time

1.   Absent exigent circumstances or exigent security concerns that are documented, the County shall offer each prisoner not subject to discipline (except in the Northwest unit), at a minimum, 18 hours out of their cell each week, and other structured programming, as follows:

    a)  At least six (6) hours per week outdoors for exercise/recreation

    b)  At least twelve (12) hours per week in a dayroom or other common area

    c)  At least four (4) hours per day, on at least three (3) separate days per week, of in-cell structured programming – *i.e.*, programming on electronic tablets.

2.   For those prisoners housed in the Northwest unit, absent exigent circumstances or exigent security concerns that are documented, the

County shall offer each prisoner not subject to discipline at a minimum, 15 hours out of their cell each week, and other structured programming, as follows:

    a) At least six (6) hours per week outdoors for exercise/recreation

    b) At least nine (9) hours per week in a dayroom or other common area

    c) At least four (4) hours every other day (*i.e.*, 3 or 4 times per week, on an alternating basis), of in-cell structured programming – *i.e.*, programming on electronic tablets.

3. The County shall provide prisoners out-of-cell time daily, at appropriate times of the day – *i.e.*, not during normal sleeping hours.

4. The County shall implement a system of documenting the amount of out-of-cell time each prisoner is offered for each of the above categories.

5. The County shall conduct monthly audits to ensure that required out-of-cell time with respect to each of the above categories is made available to the jail population.  Supervisory staff shall regularly review this data for quality assurance, and take steps to address any deficiencies.

6. In cases where a prisoner refuses out-of-cell time repeatedly and the reason for such refusals may be related to their mental health condition, Jail staff shall make a mental health referral for assessment and appropriate clinical follow-up.

E. **Disciplinary Procedures**

1. A prisoner may be housed in Segregation for disciplinary purposes only after the prisoner has received notice of the charges against him/her, a supervisor has conducted a disciplinary hearing at which the prisoner is given an opportunity to rebut the charges, and the prisoner is adjudicated guilty of the alleged violation(s).  Where there is a serious and immediate safety risk and no other housing unit is sufficient to protect the inmate from harm, staff may place a prisoner in Segregation for the shortest period of time necessary.  In such cases, supervisory custody staff will promptly review the case and must approve in writing continued retention in Segregation.

2. Prisoners serving a disciplinary term in Segregation may be subject to a reduction in out-of-cell time, including in-cell confinement not to exceed twenty-two (22) hours per day.

3. The County shall implement a 30-day maximum term in Segregation for any single or set of disciplinary violations stemming from the same incident.

4. The County shall not use safety cells for punishment.

5. The County shall not use the denial or modification of food as punishment. The County shall not use the "prison loaf" as a disciplinary diet.

F. **Safeguards for Prisoners Placed in Segregation**

1. Prior to Segregation placement of any person with Serious Mental Illness, with an intellectual disability, or who is exhibiting unusual or bizarre behavior, the County shall ensure completion of the mental health review process detailed in Section VII of the Mental Health Remedial Plan.

2. The County shall conduct visual cell checks (to ensure that prisoners are safe and breathing) for all prisoners in Segregation at least every 30 minutes, at staggered intervals. Completion of safety checks shall be timely documented and audited regularly by supervisory staff for quality assurance purposes.

3. Health care staff shall conduct check-ins three times per week to assess and document the health status of all prisoners in Segregation, and shall make medical and mental health referrals as necessary.

4. A Qualified Mental Health Professional shall conduct check-ins at least three times per week to assess and document the mental health status of all prisoners in Segregation and shall make referrals as necessary. The check-in shall include the following:

   a) Conversation with each prisoner;

   b) Visual observation of the prisoner's cell, including the cleanliness of the prisoner's clothing and bed linens; and

   c) Inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider.

5. If a prisoner in Segregation requests a confidential health care contact or staff identify a mental health or medical need warranting

follow-up, staff shall arrange for evaluation and treatment of the prisoner in an appropriate confidential setting.

6. If health care staff observe a prisoner's medical or mental health condition deteriorate in Segregation, they shall promptly confer with supervisory level custody staff to discuss the need for higher level of care or alternative placement to address the prisoner's condition. This conference will be documented in the prisoner's record.

    a) The County shall not place the following prisoners in Segregation unless necessary to address current, specific safety concerns that are documented, with supervisory-level review and approval, and in such cases only for the minimum time necessary to identify an alternative appropriate placement: Prisoners with acute medical or mental health needs that require an inpatient level of care and/or daily nursing care;

    b) Prisoners who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy.

7. The County shall avoid the release of prisoners from custody directly from Segregation to the maximum extent possible.

8. If a prisoner has an expected release date in less than 60 days, the County shall take and document steps to move the prisoner to a less restrictive setting, consistent with safety and security needs. Should Segregation become necessary during this time period, the County shall provide individualized discharge planning to prepare the prisoner for release to the community, including in light of the prisoner's Jail housing placement and status.

G. **Grievances, Inmate Request Forms, Property/Privileges in Segregation**

1. The County shall provide grievance forms and inmate request forms in each housing unit for prisoners to readily access and use.

2. Prisoners housed in Segregation units shall have equal access to grievance and inmate request forms and procedures as compared to general population prisoners.

3. The County shall allow reasonable access to the following for all prisoners, including those in Segregation, absent a specific safety or security issue that is documented:

    a) Personal phone calls on a daily basis during normal business hours.

    b) Education, rehabilitation, and other materials (*e.g.*, books, magazines, radios, writing implements, art supplies, tablets) for in-cell activities.

H. **Other Custody Operations**

1. Capacity of Jail Facilities

    a) No later than January 1, 2021, the number of prisoners placed in a particular housing unit shall be limited to no more than the rated capacity.

    b) No later than January 1, 2021, the County shall assign a bed to all prisoners.

    c) The County shall establish procedures to ensure that no prisoner is placed in any cell or housing unit without a mattress and appropriate bedding, unless there are individualized clinical or security concerns that are documented.

    d) Female prisoners shall be separated by sight and sound from male prisoners.

## VIII. STAFFING FOR HEALTH CARE SERVICES

1. The County shall establish and maintain appropriate Qualified Health Professional staffing levels and sufficient custodial staff to provide timely escorts for inmates to health care appointments.

2. The County shall perform the following analyses:

    a) Comprehensive staffing analysis based on a needs assessment, to include medical and mental health care providers and clinical staff, office and technological support, Quality Assurance staff, supervisorial staff, and custody staff for escorts and transportation;

    b) Determination of the number of positions required in each discipline for health care needs at each facility, based on current populations;

    c) Timeline for implementation of the staffing analysis (including authorization, funding, and hiring).

3.  The County shall regularly monitor and adjust, as needed, staffing in order to ensure timely access to care.

## IX.  TRAINING RELATED TO TREATMENT OF PRISONERS WITH SPECIAL NEEDS

1.  The County shall develop and implement training, through various mediums including memorandums, briefings, online presentations, and/or classroom presentations, for Jail custody staff on the provisions described in this remedial plan, as well as general correctional health care issues, including crisis intervention techniques, recognizing different types of medical and mental health conditions and appropriate responses, developmental/intellectual disability, descalation and crisis intervention, suicide/self-harm prevention, cultural diversity, health care referral practices, and confidentiality standards.

2.  Jail custody staff training on implementation of remedial plan provisions shall be completed within 90 days of the effective date of this remedial plan.  Jail custody staff shall receive at least eight (8) hours of training on all other topics described above on a bi-annual basis. The County shall keep records documenting all such trainings and training participants.

3.  Jail custody staff assigned to specialized units that house people with serious mental illness shall receive four (4) additional hours of pre-service training, and on a bi-annual basis thereafter, on working with people with mental health needs, special medico-legal considerations, de-escalation and specialized management techniques, and the Jail's mental health treatment programs.

4.  The County shall ensure that the health care services provider develops and implements training for health care staff to ensure timely implementation of and ongoing adherence to the provisions described in this remedial plan. The County shall keep records documenting all such trainings and training participants.

5.  The County shall review and revise (as necessary) suicide prevention training for custody, health care, and other relevant staff, and ensure that it adequately covers the following topics:

    a)  avoiding obstacles (negative attitudes) to suicide prevention;

    b)  why facility environments are conducive to suicidal behavior;

    c)  identifying suicide risk;

    d)  predisposing factors to suicide;

    e)  high-risk suicide periods;

    f)  suicide risk warning signs and symptoms;

    g)  components of the County's jail suicide prevention program;

    h)  liability issues associated with prisoner suicide; and

    i)  crisis intervention.

6.    The County shall provide all custody staff with at least eight hours of initial training and at least two to four hours of annual training, through various mediums including memorandums, briefings, online presentations, and/or classroom presentations, regarding suicide prevention and the identification and approach to prisoners with mental illness.

7.    All health care staff shall receive at least two hours of training annually on suicide prevention and related mental health treatment and management issues. Annual training shall include a review of the current Jail suicide prevention policy and program.

8.    All custody and medical staff shall be trained in first aid and CPR.

# EXHIBIT B

*Murray v. County of Santa Barbara*

**Duties of Experts**

The parties set forth the duties of the Remedial Plan Experts as follows.

1.      The Remedial Plan Experts shall advise the parties on Defendants' compliance or non-compliance with the Remedial Plan, to assist the parties and Court with Dispute Resolution matters and to provide testimony, if required, in any proceedings before the Court.

2.      Within 180 days after entry of this Stipulated Judgment, and then annually thereafter during the term of this Stipulated Judgment, the Remedial Plan Experts shall each complete a review and non-confidential report ("Annual Report") to advise the parties on Defendants' compliance or non-compliance with the Remedial Plan.

3.      In each Annual Report, the Remedial Plan Experts shall state their opinion as to whether Defendants are or are not in substantial compliance with each component of the Remedial Plan within the Remedial Plan Expert's respective area of expertise.  These opinions are referred to in the Stipulated Judgment as "Substantial Compliance Determinations."

4.      The Annual Reports will provide, to the extent possible, specific recommendations as to how Defendants may reach substantial compliance.  The Parties shall have an opportunity to respond to any finding regarding Defendants' substantial compliance with a provision of the Remedial Plan.  The Parties shall submit any such response to the Remedial Plan Experts and all counsel within 30 calendar days of the Annual Report completion.  Such response(s) shall be appended to the final report.

5.      The Annual Reports shall be considered separate and apart from any evaluations and reports prepared as part of the Dispute Resolution process set forth in the Stipulated Judgment.  The Annual Reports may be submitted to the Court for purposes of future proceedings.

6.      The Remedial Plan Experts shall be entitled to reasonable compensation based on the cost estimates provided in their respective agreements with the Parties, which shall be paid by Defendants.

7.      With appropriate notice, the Remedial Plan Experts shall have reasonable access to all parts of any facility. Access to the facilities will not be unreasonably restricted.  The Remedial Plan Experts shall have access to correctional and health care staff and people incarcerated in the jails, including confidential and voluntary interviews as is reasonable to complete a report and provided it does not implicate security or other privileged information. The Remedial Plan Experts shall also have access to non-privileged documents, including budgetary, custody, and health care documents, and institutional meetings, proceedings, and programs to the extent the Remedial Plan Experts determine such access is needed to fulfill their obligations. The Remedial Plan Experts' tours shall be undertaken in a manner that does not unreasonably interfere with jail operations as reasonably determined by jail administrators.   The Remedial Plan Experts shall have reasonable access to individual prisoner health records, including mental health records, and custody records.

8.      The Remedial Plan Experts shall be provided with and agree to be bound by any protective or Court orders entered in this case.

9.      The Remedial Plan Experts may engage in *ex parte* communications with the parties and with each other.  The Remedial Plan Experts shall not engage in *ex parte* communications with the Court.

10.     Pursuant to the Dispute Resolution procedures set forth in the Stipulated Judgment, either party may request that the relevant Remedial Plan Expert evaluate any issue in dispute and prepare a report.  The Remedial Plan Expert must provide the report regarding the area of disagreement to the parties within 45 calendar days of the request.  Defendants will pay the reasonable fees as

set forth in the Remedial Plan Expert's agreement with the parties for any report prepared by a Remedial Plan Expert at the request of a party about a disputed issue.

11.     The Remedial Plan Experts shall be available to meet with the parties in person or by telephone in a manner that is reasonable and convenient for the purposes of clarifying any findings and assisting in resolution of any disputes.

12.     At the request of the Court, the Remedial Plan Experts shall attend any negotiations, mediation sessions, or court hearings.